In re INTERNATIONAL LOAN
NETWORK, INC., Debtor.

Francis P. DICELLO, Plaintiff,

v.

Ethel JENKINS, Christopher Beal, Ellen Bristol, Peter Lor, George Miller, Minnie Moore, David Parker, Xay Fong Lee, Alice Jackson, Willie J. Henderson, Stephens Day Care, James W. Stephens, Phyllis Baughman, Mary Goldston, Eileen Hart, Edward Segers, Dorothy Thompson and Isabella Williams, Defendants.

Bankruptcy No. 91–01094.
Adv. Nos. 92–0147, 92–0149, 92–0151, 92–0154 to 92–0162, 92–0164, 92–0171, 92–0172, 92–0213, 92–0220, 92–0222, 92–0231, 92–0234 and 92–0238.

United States Bankruptcy Court,
District of Columbia.

Oct. 6, 1993.

**4**

Philip M. Musolino, Musolino & Dessel, Washington, DC, for defendants.

Lee W. Morris and Ross P. Spicer, Hazel & Thomas, Washington, DC, for plaintiff.

### DECISION GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

These eighteen adversary proceedings involve complaints filed by the trustee against investors in a Ponzi scheme to recover alleged fraudulent conveyances. The defendants contend that the funds are not recoverable by the trustee.

## BACKGROUND

On October 10, 1991, Francis P. Dicello, as receiver of International Loan Network, Inc. ("ILN"), filed separate voluntary petitions on behalf of ILN and International Loan Network Development Corporation ("ILNDC") for relief under chapter 11 of the Bankruptcy Code. On October 11, 1991, Dicello was appointed trustee for both debtors. These two cases were later substantively consolidated by order of this court.

On August 26, 1992, the trustee filed a Complaint to Avoid and Recover Fraudulent Transfers and Conveyances pursuant to 11 U.S.C. §§ 548(b), 548(a) and 550 against eighteen investors. The trustee's principal cause of action alleges that transfers of money or payments to investors in amounts greater than the amount they invested ought to be recovered on the grounds that the payments constituted (1) fraudulent conveyances voidable under 11 U.S.C. § 548; or (2) fraudulent conveyances voidable pursuant to Md.Com.Law Code Ann. § 15–201 *et seq.* (Maryland Uniform Fraudulent Conveyance Act) and hence are voidable pursuant to 11 U.S.C. § 544(b).

On June 21, 1993, the trustee filed a motion for summary judgment supported by the affidavits of accountant Daniel G. Lentz and attorney Constance H. Francois, and a memorandum of points and authorities with accompanying exhibits. Thereafter, the defendants filed a response in opposition to the trustee's motion for summary judgment.[1]

---

1. Although these eighteen individual adversary proceedings have not been consolidated, the defendants by order of this court were allowed to join in a consolidated response in Adversary Pro-

The trustee filed a reply with a supplemental affidavit of Francois. The defendants responded with a supplemental appendix of exhibits. Oral argument was partially heard on August 31, 1993 and again on September 10, 1993, and the matter was taken under advisement.

## DISCUSSION

■ F.R.Civ.P. 56 is made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Pursuant to this rule, summary judgment is only appropriate where there is no genuine issue of material fact when viewing the evidence most favorable to the opposing party and the movant is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–57, 90 S.Ct. 1598, 1606–08, 26 L.Ed.2d 142 (1970); *In re Baker & Getty Fin. Serv. Inc.*, 98 B.R. 300, 304 (Bankr. N.D.Ohio 1989). Initially, the burden is on the movant to inform the court of the basis for the motion and to demonstrate the absence of a genuine issue of material fact. *Bias v. Advantage Intern, Inc.*, 905 F.2d 1558, 1560 (D.C.Cir.), *cert. denied*, 498 U.S. 958, 111 S.Ct. 387, 112 L.Ed.2d 397 (1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, once a motion has been made and properly supported, the opposing party may not rely on mere allegations or denials, but instead the opponent must set forth specific facts showing that there is a genuine issue of material fact for trial. *Clifton Terrace Assoc. v. United Technologies*, 728 F.Supp. 24, 28 (D.D.C.1990), *aff'd in part, rev'd in part,*

929 F.2d 714 (D.C.Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986)).

Defendants have objected to the admissibility of the two affidavits provided by the trustee in support of his motion for summary judgment, asserting that the trustee did not provide the proper foundation for the introduction of expert testimony and failed to meet numerous evidentiary requirements.[2] In addition to objecting to the above affidavits, the defendants have objected to the court's consideration of trustee's exhibits 2, 4, and 5,[3] asserting that the trustee did not properly authenticate the exhibits or establish the appropriate evidentiary foundations. Therefore, before reaching the issue of whether there are any genuine issues of material fact, the court must first determine whether it may properly consider the affidavits and supporting exhibits in support of trustee's motion.

## I. *EVIDENTIARY ISSUES*

### A. *Admissibility of Lentz's Affidavit*

■ Lentz's affidavit satisfies the requirements of Fed.R.Evid. 703 and is therefore admissible.[4] *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316–18 (9th Cir.1985); *Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir.1980). In forming his opinion regarding ILN's financial condition, Lentz relied upon the following documents: ILN literature, marketing brochures, memoranda, correspondence, financial statements, ILN's Schedules of Assets and Liabilities, interviews with former

ceeding No. 92–147 to the trustee's motion for summary judgment provided, however, that any arguments unique to a defendant were clearly set forth. The only differences set forth with respect to each defendant were the amounts of money invested in ILN and the amounts of payments received. The legal arguments were the same for each defendant. The court will address the various monetary amounts at the end of this opinion.

2. More specifically, the defendants allege that there is no foundation for considering the expert testimony or opinion offered by Lentz, that Lentz draws conclusions beyond his area of expertise and that Lentz fails to offer any factual basis for some of his conclusions.

3. The exhibit numbers that the defendants refer to in their memorandum are different than the numbers the trustee has assigned to the exhibits. Thus, for purposes of this decision, exhibit 2 refers to the correspondence letters, exhibit 4 refers to the copies of checks, and exhibit 5 refers to the marketing literature. These exhibits will be described in more detail in this opinion.

4. Fed.R.Evid. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

ILN employees, testimony given in connection with the Securities and Exchange Commission's injunction action against ILN, and upon the written opinions of the United States District Court for the District of Columbia, *S.E.C. v. Int'l Loan Network, Inc.,* 770 F.Supp. 678 (D.D.C.1991) (Judge Hogan) and of the United States Court of Appeals for the District of Columbia Circuit affirming Judge Hogan's opinion. *S.E.C. v. Int'l Loan Network, Inc.,* 968 F.2d 1304 (D.C.Cir.1992). (*See* Lentz Aff. ¶ 4.)

■ The information Lentz relied upon is of the type reasonably relied upon by accountants and auditors in forming an opinion or inference regarding the financial condition of a company. (Lentz Supp.Aff. ¶ 3.) *See also Intern. Adhesive Coating Co. v. Bolten Emerson Intern.,* 851 F.2d 540, 545 (1st Cir. 1988) (corporation's business and financial records and interviews with company personnel were sources of information normally and reasonably relied upon by accountants pursuant to Fed.R.Evid. 703); *United States v. Affleck,* 776 F.2d 1451, 1456–58 (10th Cir. 1985) (accountant's reliance on discussions with employees in forming opinion regarding solvency of corporation admissible where corporation records incomplete). That some of the evidence Lentz relied upon was hearsay does not affect the admissibility of his conclusions or opinions. *Affleck,* 776 F.2d at 1456–58; *Paddack v. Dave Christensen Inc.,* 745 F.2d 1254, 1262 (9th Cir.1984).

The defendants had almost a full year to examine all of the business and financial records Lentz relied upon, yet chose not to investigate, expose or rebut any of Lentz's opinions. *See In re Helionetics, Inc.,* 70 B.R. 433, 438 (Bankr.C.D.Cal.1987) (if party had questions regarding affiant-expert's back-up information, party should have deposed expert to discredit basis for opinion rather than speculate on independence and validity of

valuation). Accordingly, Lentz's affidavit and supplemental affidavit are accepted as submitted in support of the trustee's motion for summary judgment.[5]

### B. *Admissibility of Ms. Francois' Affidavit*

■ The defendant's objections to the admissibility of Francois' affidavit are simply without merit. Francois was a former director of legal services for the debtor and has personal knowledge of ILN's operations both pre-petition and post-petition. Her statements in the affidavits are based on her first hand experiences as an employee of ILN. Thus, the only issue regarding the affidavit, if one exists, is the weight to be given to her testimony as set forth in the affidavit. The court will consider these affidavits.

### C. *Exhibits 2, 4 and 5*

■ Defendants objected to the admissibility of exhibits 2, 4 and 5 to the trustee's motion for summary judgment, asserting various evidentiary inadequacies. Exhibit 2 consists of approximately nine items of correspondence allegedly from various regulatory bodies to ILN officers. However, there is no affidavit authenticating the letters as true and accurate copies and therefore the court agrees that this exhibit is not admissible as evidence in support of the trustee's motion.[6]

■ Exhibits 4 and 5, however, are admissible. Exhibit 5 consists of the Statement of ILN's Marketing Policies and Procedures, an excerpt from ILN's Membership Handbook entitled Property Rights Acquisition and an ILN circular entitled Continuing Education Institutes Circular. Francois' supplemental affidavit lays a sufficient foundation to admit these items as authenticated documents that fall within the business records exception to the hearsay rule.[7] Fed.R.Evid. 803(6).

---

5. The documents attached to Lentz's affidavit are not admissible as evidence. They were only offered to provide a sample as to what Lentz relied upon in forming his opinion.

6. Given the outcome of this opinion, this exhibit is not critical to the trustee's motion and therefore the trustee's request that he be granted leave to provide authentication will not be granted.

7. The supplemental affidavit states that these documents are "true and accurate copies, made by a regularly conducted business activity, kept in the regular course of ILN's business, pursuant to regular business practice, made by a person with knowledge of their contents." (Francois Supp.Aff. ¶ 3.)

■ In the same fashion, Francois' affidavit properly authenticated exhibit 4, which consists of copies of checks issued by ILN to the individual defendants, and provided a sufficient foundation for their admissibility into evidence. (Francois Aff. ¶¶ 4, 5.) In addition, the trustee properly points out the self-authenticating nature of commercial paper and related documents pursuant to Fed. R.Evid. 902. *See Baker & Getty Fin.*, 98 B.R. at 305 (copies of checks submitted in support of trustee's summary judgment motion deemed admissible).[8]

Accordingly, the affidavits, supplemental affidavits and all the exhibits introduced by the trustee, except for exhibit 2, are accepted as evidence submitted in support of the trustee's motion for summary judgment.

### D. *ILN's Operations*

■ The trustee's argument in this case is dependent upon the finding that ILN was a Ponzi scheme.[9] However, the court is faced with an unusual record concerning the issue of ILN's operations. Lentz describes ILN's operations in his affidavit, but not all those facts should be treated as admissible evidence since his description is for the most part based on hearsay. Yet the defendants in their papers and exhibits acknowledge the general description provided by Lentz. Moreover, the defendants fail to offer any evidence that would controvert Lentz's conclusion. In fact, much of Lentz's description can be derived from the numerous exhibits introduced by both parties. Finally, the United States District Court for the District of Columbia has enjoined ILN's operations, and in doing so found that ILN was nothing more than a pyramid or Ponzi scheme. *S.E.C. v. Int'l Loan Network*, 770 F.Supp. 678 (D.D.C.1991), *aff'd*, 968 F.2d 1304 (D.C.Cir.1992). However, the defendants assert that this court cannot properly take judicial notice of the district court's findings.

For the reasons that follow, this court concludes that the trustee has established that ILN was a Ponzi scheme. Lentz's opinion is well supported by his affidavit and is unrefuted. The district court's findings are admissible and independently corroborate Lentz's opinion.

### *Lentz's opinion is well supported by his affidavit*

Lentz's opinion is admissible and that really ends the inquiry. The court nevertheless takes pains to demonstrate that Lentz has shown in convincing fashion that his opinion is well founded. The ultimate point is that the defendants have not put in opinion evidence contrary to Lentz's opinion and have not refuted even one of the many items of fact Lentz relied on in making his opinion.

1. According to Lentz, "ILN was, at all relevant times, a Ponzi or pyramid investment scheme, where returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted investors." (Lentz Aff. ¶ 3.) He arrived at this conclusion after his review of numerous documents, interviews, and additional information as was described previously. To provide a better understanding of his assessment of ILN's financial condition, Lentz provided a description of how ILN was structured. Much of his description of how ILN operated is supported by exhibits independently in evidence (which are cited in this discussion). According to Lentz, any person interested in joining ILN had to send a $125 Basic Membership Fee and an Application to ILN's corporate headquarters in Lanham, Maryland. Once ILN accepted the Application, the individual became a Basic Member who

---

8. It also appears that in each of the eighteen adversary proceedings the defendants have admitted to receiving some of the checks appearing in exhibit 5. (Def's Ans. to First Set of Interrog. # 6.)

9. A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted

investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors. *In re Independent Clearing House Co.*, 77 B.R. 843, 847 n. 2 (D.Utah 1987) (*en banc*), *aff'g in part, rev'g in part*, 41 B.R. 985 (Bankr.D.Utah 1984). For a colorful history of Ponzi scheme operations, *see* 41 B.R. at 994–995 n. 12.

was entitled to certain benefits and services, including discount shopping and travel provided by Consumer Benefit Services, Inc. Basic Members interested in participating in ILN's property programs (the PAC and PRA programs) were required to invest an additional $100, $500, or $1,000. The payment to ILN of any one of these amounts resulted in the enrollment of the Basic Member in the $100, $500, and the $1,000 Club, respectively. (*See* Trustee's ex. 5.) Yet ILN did not ultimately retain most of the Club fees, but rather distributed substantial amounts of those fees to successive generations of ILN members through the Capital Fund Bonus System.

2. The Capital Fund Bonus System was set up to provide members with an incentive to recruit additional individuals to ILN. For each new member recruited, the recruiter, known as an Independent Representative (IR), received descending percentages of the Club membership and PRA fees paid by subsequent new members recruited "downline" through the fifth level of recruitment. (*See* Independent Representative Agreement, Def.'s ex. 10.) For each person recruited by an IR, ILN agreed to distribute 100% of all Club fees paid by any newly recruited member. In addition, 50% of any property program fees (described below) paid by a newly recruited member would also be distributed in a like fashion. These fees were distributed as follows: 50% of the fees collected from New Member (A) would be distributed to his recruiting IR. The recruiting IR would then receive 15% of any collections from New Members B and C, recruited by New Members A and B respectively. Finally, 10% of any collection from New Members D and E, recruited by New Members C and D, respectively, would also be distributed to the original recruiting IR. (*See* Def.'s Ex. 5.) A similar pyramid would be started for each new member recruited by the IR, each of which would assure 100% distribution of Club fees received and 50% distribution of property program fees, so long as the pyramids continued to attract new members.

3. $500 and $1,000 Club members were eligible to participate in ILN's property programs, known as the Property Acquisition Certificate (PAC) and the Property Rights Assignment (PRA) which was later renamed Property Rights Acquisition (PRA). In the PAC program, a $500 or $1000 Club member had to invest an additional $10,000 (Standard PAC) or $25,000 (Super PAC) to participate. ILN promised Standard PAC members that they would receive an assignment of rights to $100,000 worth of real estate, or could elect to be paid $100,000 cash in monthly installments. If a member failed to receive property or the cash payments, the member was entitled to a full refund of his money, plus 50% interest per annum. Super PAC members were made essentially the same offer as Standard PAC members, but in higher amounts. Super PAC members would receive either $250,000 in real estate or cash. The PAC program was cancelled in early 1990 and on February 26, 1990, the president, Melvin Ford, suspended the cash payment aspect of the PAC program. On March 2, 1990, the members were advised that ILN was discontinuing the PAC program and that refunds would be forthcoming.

4. In May of 1990, ILN implemented a new property program entitled Property Rights Assignment. These members, upon paying a fee, were to be assigned tax lien certificates to properties, or actual property, within 180 days after ILN received and accepted the PRA membership application. An unsatisfied member of this program had the right to cancel and receive a full refund through March 15, 1991. The properties for which tax lien certificates were issued were to have appeared in lists sent to investors from time to time. However, only one list was ever distributed on or about January 15, 1991. Lentz found no evidence in the records of ILN to support there ever having been an assignment of tax lien certificates or actual real property to members. Nor have any defendants alleged that they received the certificates or real property. The only returns to PRA members were in the form of cash payments.

5. On March 1, 1991, the Property Rights Assignment program was changed to the Property Rights Acquisition program. These members were required to take three introductory courses dealing with real estate

acquisition. After doing so, the member could participate in the PRA Selection Service. Under this Service, a member could select properties with an assessed value of up to fifty times the PRA value from a list of available tax lien certificates. However, the member's PRA fee was not applied to the purchase of any certificates. Instead, the member was responsible for this expense, as well as other acquisition costs. ILN retained only 50% of the property program dues paid by members, and distributed the remainder to investors through the Capital Fund Bonus System.

6. These programs were enjoined by the United States District Court for the District of Columbia in July of 1991.

Lentz's affidavit thus sets forth a sufficient basis for the opinion he reached.

### Lentz's opinion is unrefuted

In any event, what is critical for purposes of this decision is that Lentz, in his expert opinion, concluded that ILN operated as a Ponzi scheme. *See In re Independent Clearing House Co.*, 77 B.R. 843, 847 n. 2 (D.Utah 1987) (*en banc*) (court accepted expert's conclusion that debtor was a Ponzi scheme). Moreover, Lentz's opinion is consistent with all the evidence in the record. (*See, e.g.,* ILN Marketing Statement, Trustee's ex. 5; ILN literature, Def's ex. 5.) Much of Lentz's description relating to how the different programs were operated can be ascertained from the exhibits both parties introduced into evidence. Moreover, the defendants have not offered any evidence that is inconsistent with either Lentz's description of how ILN operated or his ultimate opinion that ILN's operations constituted a Ponzi scheme. In fact, the defendants admitted that they participated in both the "downline" programs and the property acquisition programs. (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ.J. at 14–15.)

### Lentz's opinion is independently corroborated by the district court's findings

In addition to Lentz's unrefuted conclusion that ILN was a Ponzi scheme, the trustee has also urged the court to take judicial notice of Judge Hogan's decision enjoining ILN's operations. In deciding to enjoin ILN's operations, Judge Hogan set forth detailed findings of fact explaining the operations of ILN and concluded, "the evidence is clear that ILN is nothing more than a glorified chain letter, destined to collapse of its own weight." *SEC v. ILN,* 770 F.Supp. at 695. The defendants object to this court taking judicial notice of the facts found by Judge Hogan as well as his ultimate characterization of ILN.

■ While the court agrees that it may not take judicial notice of the facts in Judge Hogan's opinion, this court is of the opinion that Judge Hogan's findings constitute admissible evidence pursuant to the catchall exception to the hearsay rule, Fed.R.Evid. 803(24).[10] The statements sought to be introduced relate to a fact that is material to the resolution of this motion—how ILN operated. The opinion is more probative on this issue than any other evidence which the trustee could procure through reasonable efforts. After all, the court must put the trustee's action in context. The trustee is seeking to recover fairly small sums of money, although recovery of these sums would benefit the estate. Forcing the trustee to bring forth voluminous evidence regarding this issue would be extremely onerous and prejudicial to the bankruptcy estate. Moreover, the defendants do not challenge Judge Hogan's or for that matter Lentz's description of how ILN operated; the thrust of their objection is that the trustee should be required to prove all the elements of his case, and ILN's operations is one such element. Forcing the

---

**10.** Fed.R.Evid. 803(24) in pertinent part makes admissible: "A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by the admission of the statement into evidence...." Notice of reliance on the hearsay statement must be given sufficiently in advance to provide the opponent with a fair opportunity to prepare to meet it.

trustee to go through a full-fledged trial, as was already held in the district court, to establish how ILN operated would require more than what is considered to be reasonable efforts. Facts set forth in an opinion by an Article III judge surely have the equivalent, if not greater, degree of trustworthiness as would facts found in an investigation made pursuant to law which are admissible pursuant to Fed.R.Evid. 803(8)(C).[11] The trustee has made it known to the defendants that he intended to offer this opinion into evidence. Therefore, all the requirements of Fed. R.Evid. 803(24) have been met and Judge Hogan's findings are admissible as evidence.

The defendants' assertion that the admission of Judge Hogan's findings would destroy the notions of collateral estoppel has no merit. The findings are admissible only as evidence of ILN's operations; they are not being admitted to conclusively establish the facts therein. The defendants had every opportunity, as they did with Lentz's conclusion, to offer contradicting evidence. They have not done so.

In conclusion, the court is satisfied that the trustee has met his burden of proving that ILN operated as a pyramid or Ponzi scheme.

## II. *TRUSTEE'S MOTION FOR SUMMARY JUDGMENT*

Before addressing the issues of law involved in this case, the court must determine whether any material issues of genuine fact exist. The defendants allege that there are numerous facts in dispute. Yet, the defendants have failed to satisfy their burden of setting forth specific facts that would establish such a dispute. The defendants did not file any affidavits opposing summary judgment, but rather relied on the defendants' answers to interrogatories and several exhib-

its consisting of various ILN documents.[12] Rather than controverting any of the trustee's factual averments, the defendants appear to rely primarily upon the strength of their evidentiary objections and their legal arguments. Having considered the pleadings, answers to interrogatories, affidavits and supporting exhibits, as well as the oral arguments, this court concludes that there are no material factual issues in dispute concerning the trustee's claims.

## III. *THE TRUSTEE'S CLAIMS*

This brings us to the question of whether, as a matter of law, the trustee may recover the prepetition payments made to the defendants through the exercise of his statutory powers. The trustee has asserted two principal claims. His first claim seeks to recover the payments as fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(2)(A). The trustee's second claim seeks to recover the payments as fraudulent conveyances under the Maryland Uniform Fraudulent Conveyance Act, which the trustee asserts pursuant to 11 U.S.C. § 544(b).

### A. *Section 548*

■ The trustee asserts that any payment made to a defendant above the amount of that individual's investment in ILN are avoidable pursuant to 11 U.S.C. § 548(a)(2), which authorizes the trustee to avoid certain transfers made within one year before the petition filing date if (1) the transfer was of an interest of the debtor in property; (2) that occurred when the debtor was insolvent, left with unreasonably small capital or unable to pay its debts as they came due; and (3) the debtor received "less than reasonably equivalent value in exchange for" the transfer.[13]

---

11. The fact that this opinion was upheld on appeal further guarantees its trustworthiness.

12. Although the court has treated the defendants' exhibits as admissible evidence, the court points out that they were not authenticated nor was a foundation laid for their admissibility into evidence.

13. Section 548(a)(2) in pertinent part, provides:
    (a) The trustee may avoid any transfer of an interest of the debtor in property ... that was

made within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
    (2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and
    (B)(i) was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...;
    (ii) was engaged in a business or a transaction ... for which any property remaining

### 1. Interest of the Debtor in the Property

The defendants assert that ILN has no interest in the property that the trustee seeks to recover on the grounds that one who obtains money by fraud obtains no title. The trustee does not dispute that the property he seeks to recover was obtained by fraud. Nevertheless, he contends that the debtor still has an interest, namely a defeasible title, in these funds. This court agrees.

An agreement induced by fraud is merely voidable, not void. *In re Universal Clearing House,* 60 B.R. 985, 996 (D.Utah 1986) (citing *United States v. 1,557.28 Acres of Land,* 486 F.2d 445, 447 (10th Cir.1973)); *Tanner v. District Judges of the Third Judicial District Court,* 649 P.2d 5, 6 (Utah 1982). The person defrauded, in this case, each of the defendants, and other investors in the debtor, may affirm the contract and sue for damages, or may rescind the contract. However, until disaffirmed, the contract is valid. *Universal Clearing,* 60 B.R. at 997. In this case, the fraud victims did nothing to avoid the transactions with ILN. Instead of rescinding their agreements with the debtor, the investors chose to accept or anticipate payments well in excess of their initial investments. While a defrauded defendant may have a claim against ILN for damages, that claim only makes the defendant a creditor; it does not vest him with title to the property with which he has parted. *Id.* at 996; *In re Moore,* 39 B.R. 571, 574 (Bankr.M.D.Fla. 1984) (fraud victim occupies same position at that of any other claimant).

Moreover, under modern law, a person who obtains property by fraud can transfer good title to a bona fide purchaser. *Universal Clearing,* 60 B.R. at 996 (referencing, *inter alia,* U.C.C. § 2–403 (1976)); *Paschal v. Hamilton,* 363 So.2d 1360 (Miss.1978). Therefore, that person must have title or at least some legally recognized interest in the property. That interest is characterized as defeasible title. *Id.* Thus, ILN has an interest in the property as required under section 548.[14]

The finding that the debtor has an interest in the property is consistent with the case law which unanimously indicates that funds transferred to investors in a Ponzi scheme are property of the debtor. *E.g., Universal Clearing* 60 B.R. at 997 ("when a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and the defrauded party does not timely avoid the transaction, the money is the property of the debtor within the meaning of section 548 of the Code"); *Independent Clearing House,* 77 B.R. at 853–54; *In re Southern Indus. Banking Corp.,* 66 B.R. 349, 363–64 (Bankr.E.D.Tenn.1986) (if creditors are all victims of the debtor's fraud and their money has been commingled with other investors' money, they cannot claim that money they received from the debtor before the bankruptcy was not the debtor's money), *In re Western World Funding, Inc.,* 54 B.R. 470 (Bankr.D.Nev.1985); *Moore,* 39 B.R. at 574. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). *See also Rosenberg v. Collins,* 624 F.2d 659 (5th Cir. 1980) (not a pure Ponzi scheme).

The defendants also assert that the funds were held by ILN in constructive trust for the defrauded investors. However, the defendants lack standing to advance such an argument. They are not claiming to hold the funds for the benefit of those individuals who received less than what they invested in ILN; to the contrary, each individual defendant wants to keep the funds they received for himself. *Moore,* 39 B.R. at 574; *Southern Indus. Banking Corp.,* 66 B.R. at 363–64. Nor have they shown that the funds can be traced such that a constructive trust could be established.

### 2. Insolvency

The second element that must be established under § 548(a)(2) is that the

with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

14. This outcome is consistent with the broad definition of property of the estate in 11 U.S.C. § 541 which does not expressly or impliedly exclude goods wrongfully acquired by the debtor. *Moore,* 39 B.R. at 574.

**12**

debtor was either (1) insolvent at the time of the transfer; (2) engaged in a business for which any property remaining with the debtor was an unreasonably small capital; or (3) intended to incur debts beyond its ability to pay as they came due. *See* 11 U.S.C. § 548(a)(2)(B)(i)–(iii). According to Lentz, "ILN was at all times insolvent, engaged in business or a transaction which resulted in property remaining with ILN that represented an unreasonably small capital, and incurred, or believed that it would incur, debts that would be beyond ILN's ability to pay." (Lentz Aff. ¶¶ 5, 54.) In light of Lentz's opinion, the burden was on the defendant to provide specific facts showing that the issue of insolvency was disputed. *See, e.g., Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15. The defendants have not met their burden; they have made no attempt to set forth any specific facts showing that there was a genuine dispute regarding ILN's insolvency. Accordingly, the court accepts Lentz's opinion as establishing that ILN was insolvent at the time of the transfers at issue.[15]

### 3. *Reasonably Equivalent Value*

The only question remaining under section 548(a)(2) is whether the debtor received "reasonably equivalent value in exchange for" the transfers. This analysis is often treated as involving two distinct determinations: (1) did the debtor receive value; and (2) if so, was the value received reasonably equivalent value. *Universal Clearing,* 60 B.R. at 998. The parties have strongly disputed this element.

Value is defined for purposes of Section 548 as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). The Code defines "debt" as "liability on a claim," 11 U.S.C. § 101(12), and a "claim" includes any

"right to payment ..." or any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment...." 11 U.S.C. § 101(5)(A)–(B). Thus, whether or not the defendants provided value in exchange for the payments they received depends upon whether ILN owed a debt to these defendants, the corollary of which is whether the defendants have any claim, or right to payment, against ILN. If a debt was owed, the payments to the defendants can be viewed as having been paid in satisfaction of a debt which constitutes value to ILN.

■ The parties agree that the defendants have a claim against ILN for the return of their initial investment. *Independent Clearing,* 77 B.R. at 857; *In re United Energy Corp.,* 944 F.2d 589, 590 (9th Cir.1991); *In re Baker & Getty Fin. Servs., Inc.,* 88 B.R. 792, 796 (Bankr.N.D.Ohio 1988).[16] From the time a defendant entrusted money to ILN, ILN was indebted to that defendant for the amount of his investment. This debt arose either as the result of a contractual obligation[17] or the defendants' right to restitution. *Id. See also Eby v. Ashley,* 1 F.2d 971, 973 (4th Cir.1924) (investor in fraudulent scheme had a right to recover his principal from the moment he was deceived into paying it), *cert. denied,* 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925). As a result, payments made to each defendant up to the amount of their original investment satisfied an "antecedent debt" of ILN, and thus ILN received value in exchange for the transfers. Moreover, this value was certainly "reasonably equivalent"; it was the exact same value—dollar for dollar. *Independent Clearing,* 77 B.R. at 857. Therefore, transfers made up to the amount of each defendant's initial

---

15. The court could have also determined that ILN, as a Ponzi scheme, was insolvent from its inception as a matter of law. *See Independent Clearing House,* 77 B.R. at 871; *Cunningham v. Brown,* 265 U.S. at 8, 44 S.Ct. at 425 (Ponzi scheme debtor was always insolvent and become more so each day the business succeeded); *Guy v. Abdalla,* 57 F.R.D. 14, 17 (N.D.Ohio 1972) (possible to establish that Ponzi scheme was insolvent from its very inception).

16. The trustee does not seek to recover any transfers up to the amount of the defendant's initial investment.

17. The defendants had the right to a full refund of the money they invested in ILN should they be dissatisfied with the program. (Lentz Aff. ¶¶ 13, 14, 20.)

investment are not avoidable pursuant to § 548(a)(2).[18]

██ Transfers to the defendants in excess of their initial investment, however, are another matter. The defendants argue that ILN was indebted to the defendants for more than the amount of their initial investment. Specifically, the defendants assert that ILN was indebted to the defendants for the following: (1) expenses incurred by the defendants in connection with ILN activities; (2) money invested in ILN on behalf of others; and (3) services provided by the defendants. Therefore, the defendants argue that transfers in excess of their initial investment satisfied these debts, and thus ILN received value in exchange for these transfers. The trustee does not dispute the fact that the defendants incurred expenses, invested money on behalf of others or spent time and money recruiting new members and promoting ILN. Rather, the trustee contends that ILN was not indebted to the defendants for any of these items and therefore ILN did not receive any value.

a. *Expenses*

The expenses incurred by the defendants cannot be viewed as having provided value to ILN given the fact that ILN expressly disavowed any liability for members' expenses. (*See* Statement of Marketing Policies and Procedures, ¶ 35; ILN's Membership Handbook, p. 31; Continuing Education Institutes, p. 6, Trustee's ex. 5.) ILN's literature made it clear that individuals were responsible for their own expenses and costs incurred in connection with their ILN activities. The defendants never had a right to payment for these expenses. Accordingly, ILN was never indebted to the defendants for these amounts and the fact that the defendants incurred expenses cannot be said to have provided any value to ILN as defined in section 548.

b. *Investments for Others*

Additionally, ILN was never indebted to the defendants for the money invested on behalf of others. It is the individual on whose behalf a defendant invested money who has a claim against ILN, not the defendant. Money paid for someone else's benefit is simply a gift to that individual. After all, it is that individual, and not the defendant, who is entitled to benefit from the money spent. ILN kept its records according to the names on the application forms, and not according to who paid the various dues and fees. (Francois Aff. ¶ 10.) Thus, even though the defendant paid the money, the right to participate in ILN belonged to the individual whose name was listed on the membership application. (Francois Aff. ¶¶ 6-8.) Accordingly, ILN is not indebted to the defendants for any money invested on behalf of another individual and these "investments" by the defendants cannot be said to have provided value in exchange for the payments they received.

c. *Services*

The defendants' final argument relating to value is that the transfers they received were in satisfaction of an antecedent debt incurred by ILN as a result of services they performed. The determination of whether these services provided value to ILN in exchange for the transfers first requires an understanding of the type of services allegedly provided. While the record is devoid of any concrete description as to the actual services that were provided, it does provide a basis for deriving a general understanding of what the services entailed. The defendants allege that they were contractually obligated to recruit, train and supervise new members which involved the expenditures of time and money. (Def.'s Supp.Mem.Opp.Summ.J. ¶¶ 1, 4, 6.) In essence, the services they provided related to the recruitment of additional members to their own downline, which in turn would increase their own returns. This generally involved making telephone calls, holding meetings, and basically "talking up" the ILN program. (*See* Adv.Pro. Nos. 92–0147, 92–0149, 92–0151, 92–0154, 92–0155, 92–0158, 92–0162, 92–0164, 92–0171 and 92–0172, Def.'s Ans. to Second Set of Interrog.

---

**18.** As stated earlier, the court will address the amounts applicable to each defendant at the end of this opinion. See part IV.

# 5; Adv.Pro. Nos. 92–0156, 92–0157, Def's.Ans. to Second Set of Interrog. # 4; Adv.Pro. Nos. 92–0213, 92–220, 92–0222, 92–0231, 92–234, 92–238, Def's.Ans. to Second Set of Interrog. # 2, Def.'s ex. 3.)

The court, or the trustee for that matter, does not doubt that such services were in fact provided. However, the fact that such services were provided does not resolve the real issue—whether ILN was indebted to the defendants for these services on either a contractual or restitutionary basis. In other words, the court must determine whether these defendants have a claim against ILN for the services provided.

i. *Universal Clearing is Distinguishable.* The defendants rely primarily upon *In re Universal Clearing House,* 60 B.R. 985, 998 (D.Utah 1986), in which the court held that recruitment services provided for a Ponzi scheme debtor constituted "value" as defined in Section 548. In *Universal Clearing,* the court held:

> ... the debtors contracted with appellants for the sale of the undertaker contracts. Pursuant to their contracts, appellants performed services thereby giving consideration to the debtors under the terms of their contracts. Accordingly, the debtors incurred the obligation to pay appellants for their services. That obligation constituted a debt that was satisfied by the payment of commissions pursuant to the contracts.

60 B.R. at 999. Even were this court to assume that *Universal Clearing* was correct on this point,[19] *Universal Clearing* is distinguishable from the case before this court. In *Universal Clearing* the court repeatedly referred to an express contract to compensate recruiters for their services. However, in our case, the defendants conceded at oral argument that there was no enforceable contract between ILN and the defendants for the services they performed.

ii. *No Debt for the Services Existed on Restitutionary Grounds.* As conceded by the defendants, any claim that the defendants have against ILN regarding their services would be for restitution instead of contract. Restitution rests on equitable principles and in its various forms (including rescission)[20] requires that it be just and equitable that the restitutionary remedy be applied. *See Mass Transit Administration v. Granite Construction Co.,* 57 Md.App. 766, 471 A.2d 1121, 1126 (Ct.Spec.App.1984) (restitution is based on notions of justice and fairness); Restatement, Restitution §§ 1 and 3. Considerations of equity and justice require that this court reject the defendants' attempts to impose a debt based on restitutionary principles.

The defendants, as recruiters, could only look to be paid out of funds they brought into the scheme by recruiting new members. ILN never suggested that the representatives would be paid from the debtor's accounts. To the contrary, ILN only promised that any money paid in by new members would be distributed to the recruiter and his or her downline. Thus, the defendants faced the obvious risk that the debtor's operations would be enjoined and their efforts would go unrewarded. They may have been unaware of this probability[21] but even so, they assumed the risk of looking only to those funds for a reward for their efforts. That they lucked out and received funds before the pyramid collapsed is no just reason for treating them differently than the unfortunate many below them in the pyramid who received nothing for their efforts.[22] Such a

---

**19.** This court demonstrates later that *Universal Clearing* would likely have been decided differently had the trustee there raised arguments the same district court later addressed, sitting *en banc,* in *Independent Clearing House.*

**20.** In oral argument the defendants characterized their debt argument as founded on restitution and at another time as founded on rescission.

**21.** The evidence suggests that some defendants were aware of the legal problems involved with

ILN's operations. (*See* Understanding Your Legal Obligation as an ILN Member, Def.'s ex. 1.)

**22.** Moreover, the defendants allege that they have not yet been paid any monies for their services. (Def.'s Ans. to Second Set of Interrog. 4, Def.'s ex. 3; Def.'s Ans. to First Set of Interrog. # 5–7, Trustee's ex. 3.) Thus, the money they in fact received must have represented some other type of payout. The defendants should not be able to retain the funds and earmark them as having been paid "in exchange for" services. These defendants must stand on equal footing

result would not be just and equitable and hence restitution would not have been applied to give them a claim. Moreover, on public policy grounds, the defendants ought not be rewarded for having been lucky enough to be amongst the few coming in at the start of the pyramid scheme. *See Moore,* 39 B.R. at 574 (ultimate goal of bankruptcy law to treat similarly situated persons fairly and equally). *Cf. Independent Clearing,* 77 B.R. at 869–70 (refusing to enforce investors' contractual right to profits in Ponzi scheme on public policy grounds).[23] Restitution is thus unavailable, both under the "just and equitable" standard and on public policy grounds, to create a debt in favor of the defendants that constituted value in exchange for the transfer to them.

iii. *No Contract Existed Here.* Even if the defendants had not conceded that no enforceable contract existed, the court would conclude that no contract existed obligating ILN to pay the defendants for their services. There was no evidence of any agreement to pay the representatives on an hourly basis at a set rate. Nor was there any mention of how the recruiters would be paid for their services other than the defendants' assertion that ILN orally promised that the defendants would receive "a commission on the monies that the new members spent...." (Def.'s Ans. to Second Set of Interrog. 4, Def.'s ex. 3.) That promise, however, does not establish anything beyond the scheme detailed in ILN literature promising the defendants that the more members they recruited, the more money they would make.[24]

At all times it was clear that the only source of payment for the services provided would be the money brought in by new members that the defendants had recruited. The defendants cannot convert what was an unenforceable agreement to pay Ponzi scheme investors for their investments of cash and recruitment of downline members into a "services" contract. It would be impossible to disregard the money investment as the necessary ticket to their realizing anything from successful recruitment efforts. Accordingly, it would be impossible to apportion the defendants' promised payoff between the money investment and services. No hourly compensation was promised for recruitment efforts. Compensation of investors was tied instead solely to the pyramid nature of their investment, rewarding them only when they successfully attracted new investors.

These defendants were not like secretaries, lawyers and other employees or independent contractors: such workers did not invest money in the debtor's pyramid scheme before they were entitled to compensation. Such workers looked solely to their services performed as the basis for compensation. The investors, in contrast, first had to invest money in the pyramid scheme before they could get the compensation promised. Only then were they entitled to look to compensation for downline investors they recruited. Their monetary investment fueled their willingness to devote energies to realizing the hoped-for profits of the pyramid operation.

iv. *Even if a Contract Existed, it Would be Unenforceable.* If innocently unaware of the scheme's fraudulent nature, the investors

---

with all the others who also provided services, yet joined too late and received little, if any, return. *Cf. Universal Clearing,* 60 B.R. at 999 n. 11 (defendants had already been paid their commissions).

**23.** The court noted: "The law allowing the trustee to avoid payments of fictitious Ponzi scheme profits as fraudulent conveyances embodies the principal [sic] that no one should profit from a fraudulent scheme at the expense of others. Were the defendants allowed to keep payments in excess of their undertakings, they would be profiting at the expense of those who entered the scheme late and received little or nothing. The fortuity that these defendants got into the scheme early enough to make a profit should not entitle

them to a reward at the expense of equally innocent undertakers who entered the scheme later, perhaps as a result of misplaced faith borne [sic] of prior undertakers' success...." 77 B.R. at 870.

**24.** This payment scheme was known as the Capital Fund Bonus System. Each additional member a defendant recruited increased that defendants "downline", which meant they would receive a portion of the money this new member paid into ILN. This is the classic operation of a Ponzi scheme—one is rewarded for their investment and recruitment efforts by receiving a portion of the money the new members pay into the scheme.

nevertheless undertook recruitment efforts because they had made a money investment and wanted promised returns on that money. They thus undertook those efforts with the risk that the scheme might prove fraudulent and the hoped-for profits fictitious. The debtors could have confessed the fraudulent nature of the scheme and placed the debtor in insolvency proceedings where the claim to a percentage of the moneys paid by new members recruited would be unenforceable on public policy grounds. *Independent Clearing House*, 77 B.R. at 858. Thus, the law would not imply a contract for services here and, even if it did, would hold the contract unenforceable.

v. *Even if a Contract Existed Here, the Services Conferred no Value.* A further reason exists why any contract for "services," if any contract existed, conferred no "value" here. The "services" provided by an investor (in conjunction with the investor's own monetary investment) ought not to be treated any differently than the "property" the defendants allowed the debtor to hold until their principal was repaid: neither furnished "value" in excess of the original money invested. In *Independent Clearing House*, 77 B.R. at 859, the *en banc* district court addressed whether use of the defendant investors' money over a period of time was "property" and hence "value" under 11 U.S.C. § 548(a)(2)(A) and concluded that the transfers in excess of the original principal advanced to the debtor, including that part of the transfers equivalent to the legal rate of interest for use of the money, did not constitute value. The court observed (*id.*):

> ... If the use of the defendants' money was of value to the debtors, it was only because it allowed them to defraud more people of more money. Judged from any but the subjective viewpoint of the perpetrators of the scheme, the "value" of using others' money for such a purpose is negative. [Citations omitted.]

In theory, the trustee is not allowed to avoid transfers made for reasonably equivalent value because creditors are not hurt by such transfers. [Citation omitted.] If the debtor no longer has the thing transferred, either he has its equivalent, in which case creditors can reach the equivalent to satisfy their claims, or his liabilities have been proportionately reduced. In either case, creditors have not been prejudiced. But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.

Similarly here, the "services" the defendants rendered conferred no value to the estate but, in fact, only worsened its condition. It would thus be contrary to the intent of the statute and against public policy to hold that the defendants are entitled to uphold the transfers based on some hourly rate for the "services" they performed.

vi. *Universal Clearing Failed to Address Arguments Raised Here.* The district court in *Universal Clearing* failed to address whether the service contracts in that case were unenforceable on public policy grounds. It appears to have assumed they were enforceable and hence that they gave rise to a "debt" which perforce constituted "value" by virtue of 11 U.S.C. § 548(d)(2)(A). Had it addressed whether the claim was unenforceable on public policy grounds, as the court did in *Independent Clearing House*, 77 B.R. at 858, it would undoubtedly have held that no "debt" existed and hence, as here, that no value was given. Moreover, it failed to measure "value" in an objective fashion as in *Independent Clearing House*, 77 B.R. at 859. On either basis, it should have held no value was given.

Accordingly, the defendants have no basis, contractual or restitutionary, to assert a claim against ILN for the value of their services. Therefore, these services did not provide value in exchange for payments made to the defendants.

d. *Value Has Not Been Established For Purposes of Either § 548(a)(2) or 548(c)*

The court therefore concludes that ILN did not receive "value" as defined in 11

U.S.C. 548 in exchange for transfers in excess of the defendant's initial investment. A fortiori, ILN did not receive a "reasonably equivalent value" in exchange for those transfers. Therefore, any transfers in excess of a defendant's initial investment that occurred within one year from the petition date may be avoided under section 548(a)(2).

Although section 548(c) provides a defense to the avoidance of certain transfers, the provision does not offer the defendants in this case any relief from the trustee's ability to avoid them. Section 548(c) provides, in relevant part, that a transferee "who takes for value and in good faith has a lien on or may retain any interest transferred...." The key word is value. As previously determined, any transfers to the defendants in excess of their initial investment were not in exchange for value. Accordingly, section 548(c) does not apply, even if the defendants acted in good faith.

### B. *Section 544(b)*

■ This brings us to the trustee's second basis for recovering the transfers, 11 U.S.C. § 544(b). Section 544(b) authorizes the trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title...."[25] The trustee argues that under the applicable Maryland law, an unsecured creditor could avoid any transfer in excess of the defendant's initial investment that occurred, significantly, up to three years before the filing of the petition in bankruptcy. Maryland Uniform Fraudulent Conveyance Act (MUFCA), Md.Com.Law Code Ann. §§ 15–201, *et seq.*[26]

■ The defendants challenge the trustee's choice of Maryland law. Thus, as a preliminary matter the court must consider whether the trustee's choice of Maryland law

is warranted. In deciding which state law should be viewed as the proper "applicable law," the court will apply District of Columbia choice of law principles. *See In re Merritt Dredging Co., Inc.,* 839 F.2d 203, 205 (4th Cir.), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988) (bankruptcy court should apply its own forum's choice of law principles). *But see In re Kaiser Steel Corp.,* 87 B.R. 154 (Bankr.D.Colo.1988) (court should exercise independent judgment). While the court is aware that there is a split of authority on whether the court should in fact apply its forum's principles or exercise its own "independent judgment," both parties have argued District of Columbia choice of law principles.[27]

■ Under District of Columbia principles, the court must first determine whether there is a conflict between the laws of the relevant jurisdictions. *Eli Lilly and Co. v. Home Ins. Co.,* 764 F.2d 876, 882 (D.C.Cir. 1985); *Fowler v. A & A Co.,* 262 A.2d 344, 348 (D.C.1970). As the defendants assert, the District has an interest as this is the place of ILN's incorporation. However, Maryland also has an interest: it is the site of the debtor's headquarters and was the principal state in which membership applications were processed and approved. Finally, the record suggests that North Carolina may also have some interest because ILN opened a regional office in that state. While neither party has addressed the relevant law in North Carolina, a conflict between Maryland and District of Columbia exists which is all that is required. *Eli Lilly,* 764 F.2d at 882. Unlike Maryland, the District of Columbia has not yet adopted the Uniform Fraudulent Conveyance Act.

■ When a conflict exists, the court must determine which law to apply. District of Columbia courts follow a modified interest analysis approach which requires the court to

---

**25.** The applicable law for determining the rights of an unsecured creditor to avoid a transfer is state law. *Independent Clearing House,* 77 B.R. at 863; *In re Roman Crest Fruit,* 35 B.R. 939, 947 (Bankr.S.D.N.Y.1983).

**26.** A significant portion of the transfers occurred prior to one year before the filing of the bank-

ruptcy petition and therefore are not avoidable under section 548. The trustee relies on section 544(b) to avoid these transfers.

**27.** Moreover, the court would reach the same result regardless of whether it applied the District's test or its own independent judgment.

determine which jurisdiction has the "more substantial interest." *GEICO v. Fietsoff*, 958 F.2d 1137, 1141 (D.C.Cir.1992); *Eli Lilly*, 764 F.2d at 882 (citing *DeMontmorin v. DuPont*, 484 A.2d 582, 585 (D.C.App.1984)); *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 (D.C.App.1985).[28] The District is ILN's place of incorporation. It also appears that at some point in time ILN had an office located in the District. However, these contacts are not as significant as the numerous transactions and extensive operations that occurred in Maryland. ILN's headquarters were located in Maryland; this was ILN's principal place of business. (Fran.Supp.Aff. ¶ 4.) All of the checks sent to the investors originated from these headquarters. *Id.* In addition, many of these checks were drawn on banks located in Maryland. *Id.* Significantly, the membership application form had to be sent to ILN's headquarters in Maryland and did not become binding "until approved and accepted at [ILN's] principal place of business." (ILN Application Form, Francois Aff. ex. 1.) Additionally, the Independent Representative Agreement and the Property Acquisition Certificate Membership Agreement stated that they would be governed by the laws of Maryland. Thus, even though members may have never set foot in Maryland, they could reasonably expect that Maryland law would govern disputes that arose. Finally, the majority of properties listed by ILN that members could allegedly choose from pursuant to the Property Program were located in Maryland.[29] Accordingly, Maryland has the "most significant interest." The trustee has established that there is no genuine issue of fact in this respect as no other finding could reasonably be reached on this record. Therefore, Maryland law is the applicable state law to be applied pursuant to section 544(b).

Before the trustee can rely upon section 544(b), he must first show that there is an actual creditor holding an allowable unsecured claim pursuant to section 502 who, under Maryland law, could avoid the transfers in question.[30] In other words, the trustee cannot act as a hypothetical creditor as allowed in section 544(a); he must show that there is a present unsecured creditor against whom the transfer was fraudulent and voidable under the controlling state law. 4 Colliers on Bankruptcy, ¶ 544.03[1] (15th ed.) at 544–20; *Independent Clearing*, 77 B.R. at 863 n. 30.

Under Maryland law, specifically Md.Com.Law.Code Ann. § 15–210, any creditor in existence at the time of the challenged conveyance may invoke the Maryland Fraudulent Conveyance Act even though their claim has not yet matured. At least 15,000 proofs of claims (the vast majority being unsecured claims) have been filed against the ILN estate, some evidencing unsecured claims that arose as early as February, 1989. Therefore the trustee has met his burden of establishing that at least one unsecured creditor exists, holding a claim allowable under 11 U.S.C. § 502, who could bring a claim under MUFCA against ILN. Technically the trustee is required to show the allowability of an unsecured claim under 11 U.S.C. § 502. He has satisfied this requirement because a claim is allowed unless it has been objected to. 11 U.S.C. § 502(a). Moreover, a duly executed and filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). Not even a suggestion has been made that all unsecured claims arising before the transfers to the defendants are unallowable.[31] Whether or not the creditor, and

---

**28.** Defendants assert that the law of the situs of the property governs to determine the applicable state fraudulent conveyance statute. However, this rule only makes sense in the case where real property is involved, and not intangibles such as money. Moreover, the debtors' bank accounts and intangible properties would be deemed located in Maryland. *In re Morse Tool, Inc.*, 108 B.R. 384, 388 (Bankr.D.Mass.1989).

**29.** Although the defendants assert otherwise, only one list of property certificates was sent to

the defendants (Lentz Aff. ¶ 16) and the majority of these properties were located in Maryland. (Francois Supp.Aff.Ex. 2.)

**30.** The trustee may satisfy his requirement by identifying just one creditor. 4 Collier on Bankruptcy ¶ 544.03, 544–17 n. 4 (15th ed. Supp. 1991).

**31.** The court thus finds it unnecessary to address whether all of the debtor's creditors would be

therefore the trustee, could actually void the transfers pursuant to MUFCA is what this court must now decide.

The Maryland Uniform Fraudulent Conveyance Act ("MUFCA") essentially parallels 11 U.S.C. § 548. The only significant difference is that under MUFCA, property fraudulently conveyed within three years of the filing of the petition in bankruptcy may be recovered. *Dixon v. Bennett,* 72 Md.App. 620, 531 A.2d 1318, 1320 n. 2 (1987), *cert. denied,* 311 Md. 557, 536 A.2d 664 (1988). While some of the transfers the trustee seeks to recover occurred more than one year before the filing, each of the contested transfers occurred within three years of the filing. Therefore, the trustee's reliance on § 544(b) and Maryland law is critical to his ability to avoid all the transfers at issue.

■ Sections 15–209 and –210 of MUFCA allow an unsecured creditor to have a conveyance set aside if the conveyance was fraudulent as to him.[32] One type of conveyance that is fraudulent under MUFCA is where the conveyance is made "by a person who is or will be rendered insolvent by it . . ., if the conveyance is made . . . without a fair consideration." Md.Com.Code Ann. § 15–204. This provision is essentially the same as section 548(a)(2), except that "fair consideration" is used instead of the term reasonably equivalent value. However, given the definition of fair consideration in the Uniform Fraudulent Conveyance Act,[33] these two terms are viewed as synonymous. *In re Otis & Edwards, P.C.,* 115 B.R. 900, 908 (Bankr. E.D.Mich.1990); *Baker & Getty Fin. Servs.,* 88 B.R. at 796; *In re Ohio Corrugating Co.,* 70 B.R. 920, 926 (Bankr.N.D.Ohio 1987).

■ As the court has previously concluded, to the extent the transfers to the defendants exceeded the defendants' investment, there was no satisfaction of an antecedent debt. Accordingly, for the reasons discussed earlier, the transfers in excess of the defendants' initial investment were not made for fair consideration. Additionally, the court has previously concluded that ILN was insolvent at the time the transfers were made to the defendants.[34] Therefore, there is a creditor who could avoid the transfers pursuant to the Maryland law, and accordingly, the trustee may avoid the transfers pursuant to section 544(b).

## IV. *RECOVERY OF TRANSFERS BY TRUSTEE*

■ To the extent that the transfers are avoidable pursuant to 11 U.S.C. §§ 548 and 544, Section 550(a) permits the trustee to recover for the benefit of the estate the property transferred or the value of such property from the initial transferee.

The transfers the trustee seeks to avoid are evidenced by copies of checks made out to the defendant and endorsed by the defendant. (Trustee's ex. 4.) Therefore, the defendants are the initial transferees from whom the trustee may recover the payments that are avoidable.

Although the defendants assert that the total amount of the payments they received from ILN are different than the total amount arrived at by the trustee, the defendants have failed to offer any credible evidence suggesting that the trustee's figures are erroneous.[35] The trustee has calculated the total amount of payments for each defendant by adding the sums found on the copies of

---

eligible under Maryland law to set aside the transfers to the defendants.

**32.** *See* Md.Com.Code Ann. § 15–201 which provides definitions of various terms used in the statute. Debt is defined as "any legal liability, whether matured or unmatured...." Creditor is defined as "any person who has any claim...."

**33.** Fair consideration is given if "in exchange for the property, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied." Md.Com.Code.Ann. § 15–203.

**34.** Section 15–202 defines insolvency as when "the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become due and matured."

**35.** In fact, the defendants often acknowledge that their records are either incomplete or erroneous. (Def.'s Ans. to First Set of Interrog. # 5–6, Trustee's ex. 3.)

the checks made out to and endorsed by that defendant. Accordingly, the court will use the trustee's figures to calculate the amount of each defendant's initial investment and the total payments they received. These figures will be set forth in Appendix A of this decision. The difference between these two figures represents the transfers that the trustee may avoid, and thus the sum that the trustee may recover from each defendant.

## V. *PREJUDGMENT INTEREST*

As this court held in the similar circumstances of *In re Tax Reduction Institute*, 138 B.R. 325, 326 (Bankr.D.D.C.1991), the trustee is entitled to pre-judgment interest from the date of the filing of each complaint at the rate in effect on that date under 28 U.S.C. § 1961(a). This amount, additionally, should be compounded annually as provided by 28 U.S.C. § 1961(b), given the passage of over a year since the adversary proceedings were filed. Finally, as in *Tax Reduction Institute*, the trustee is entitled to post-judgment interest on the entire judgment amount as provided by 28 U.S.C. § 1961(a).

### APPENDIX A

| Adv. Proc. No. | Total Invested (thousands) | Total Received (thousands) | Total Avoidable (thousands) |
|---|---|---|---|
| 1) 92–147 | 72,775 | 127,756.68 | 54,981.68 |
| 2) 92–149 | 63,425 | 119,245 | 55,820 |
| 3) 92–151 | 29,925 | 83,560 | 53,635 |
| 4) 92–154 | 19,275 | 86,077.50 | 66,802.50 |
| 5) 92–155 | 27,625 | 100,510 | 72,885 |
| 6) 92–156 | 17,625 | 98,666.67 | 81,041.67 |
| 7) 92–157 | 2,375 | 63,640 | 61,265 |
| 8) 92–158 | 18,875 | 74,795 | 55,920 |
| 9) 92–162 | 5,293.37 | 78,016 | 72,722.63 |
| 10) 92–164 | 39,850 | 113,600 | 73,750 |
| 11) 92–171 | 22,625 | 89,825 | 67,200 |
| 12) 92–172 | 2,250 | 87,139.50 | 84,889.50 |
| 13) 92–213 | 36,550 | 67,121.64 | 30,571.64 |
| 14) 92–220 | 13,000 | 63,450.25 | 50,450.25 |
| 15) 92–222 | 18,375 | 79,408 | 61,033 |
| 16) 92–231 | 35,650 | 89,570 | 53,920 |
| 17) 92–234 | 28,875 | 85,805 | 56,930 |
| 18) 92–238 | 28,875 | 81,690 | 52,815 |