59 F.3d 1078
 27 Bankr.Ct.Dec. 626, Bankr. L. Rep. P 76,555
 In re M & L BUSINESS MACHINE COMPANY, INC., Debtor.
Christine J. JOBIN, as Trustee of M & L Business Machine
Co., Inc., Plaintiff-Appellee,
v.
YOUTH BENEFITS UNLIMITED, INC., a Colorado Corporation,
Defendant-Appellant.
 No. 94-1118.
 United States Court of Appeals,
Tenth Circuit.
 July 12, 1995.
 
 William A. Richey (Jeffrey A. Weinman, with him on the briefs), of Jeffrey A. Weinman, P.C., Denver, CO, for defendant-appellant.
 Christine J. Jobin (Dana M. Arvin and Charles F. McVay, with her on the brief), of The Jobin Law Firm, P.C., Denver, CO, for plaintiff-appellee.
 Before KELLY, SETH, and HENRY, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 The Trustee in Bankruptcy for M & L Business Machine Company (the Debtor on October 1, 1990 in a voluntary filing originally under Chapter 7 of the Act) brought this adversary proceeding pursuant to 11 U.S.C. Sec. 549 against Youth Benefits Unlimited, Inc. The Trustee sought to avoid-recover an unauthorized post-petition transfer of funds from the bank account of the debtor-in-possession to Youth Benefits.
 
 
 2
 The Bankruptcy Court and the United States District Court for the District of Colorado held that the transfer of $40,000 to Youth Benefits could be recovered by the Trustee. Youth Benefits has appealed. Youth Benefits has also raised an issue whether it should have had a jury trial.
 
 
 3
 The nature of the transactions and the source of the funds in question are undisputed. M & L Business Machine Company, the Debtor in these proceedings, was operating what has become known as a "Ponzi" scheme in which Youth Benefits and many others "invested." This scheme is a fraudulent enterprise in which funds from more recent investors provide the only source to pay interest to prior investors or to provide the return of principal promised to prior investors. See Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); Commodity Futures Trading Commission v. Chilcott Portfolio Management, Inc., 713 F.2d 1477, 1480 (10th Cir.1983). See also In re Hedged-Investments Associates, Inc., 48 F.3d 470 (10th Cir.1995) (concerned with 11 U.S.C. Sec. 547 and a pre-petition preference). There has been much litigation concerning these schemes. Usually a sham business or small business is used, as here, in which individuals or organizations are solicited to invest large amounts of capital. Postdated checks or promissory notes are given the investors. Extremely high interest rates are paid to early investors and there may be a return of principal. All payments come from funds provided by more recent investors. By actually paying excessive "profits" to earlier investors as mentioned above, the sham organization is able to attract more investors.
 
 
 4
 A bit of history would seem to be in order with a personal look at the inventor of this scheme which has so long persisted. The origin of the original Ponzi scheme is best described by the Bankruptcy Court for the District of Utah in In Re Independent Clearing House Company, 41 B.R. 985, 994 n. 12 (1984). That court stated:
 
 
 5
 "[Charles] Ponzi began in December, 1919, with $150.00 in capital, borrowing money on his promissory notes. Ponzi represented that he could take advantage of the differences in currency exchange rates following World War I.... Ponzi offered to share this profit with investors, who were promised a 50 percent return on 45 day notes. Ponzi actually made no investments of any kind, and all of the money he had at any time was the result of the loans made by investors. Ponzi issued notes in excess of 14 million dollars, and made payments of about 9 million dollars to his investors. On August 1, 1920, a Boston newspaper exposed Ponzi as a charlatan, and there was a wild scramble by investors to present their notes for payment. On August 9, 1920, an involuntary petition in bankruptcy was filed against Ponzi. At the time the petition was filed, Ponzi's outstanding liabilities were $6,948,267.88, and his total assets were $2,195,685.56. Ponzi refused to disclose to the referee the nature of his business, and whenever questioned on the point invoked his fifth amendment privilege against self-incrimination. But from a careful examination of Ponzi's books and records, accountants established that he had never engaged in a regular business, that no source of profit existed, and that he was insolvent from the inception of his venture. Ponzi was sentenced to prison, from which he was paroled after three and one-half years. He was re-arrested in Florida and sentenced to jail for a real estate fraud in which investors were promised 200 percent profit in sixty days. After serving seven years imprisonment, he was deported to Italy, where Mussolini gave him a job in the finance ministry. Ponzi left Italy for South America, and ultimately died penniless in a charity ward in Rio de Janeiro."
 
 
 6
 The $40,000 Cashier's Check Dated October 5, 1990
 
 
 7
 This check was received and cashed by Youth Benefits. This amount is sought to be recovered, to be avoided, under Section 549, by the Trustee, as above mentioned. The funds came from the debtor-in-possession's account about four days after the petition was filed on October 1. This transaction was not authorized. The record shows that all funds there in the account were derived from the Ponzi scheme operated by the Debtor. At the time the funds for the $40,000 cashier's check were charged against the debtor-in-possession account, there was about $300,000 in the account.
 
 
 8
 There were some 1,700 individuals and organizations which had invested about 74 million dollars in M & L during the critical period of time. The Debtor's records were, for all practical purposes, useless or nonexistent. There was no way whereby the investments of particular persons could be related to any account or fund. It was not possible to trace individual investments. It is also apparent that a particular investor could not trace the funds provided to any accounts or funds of M & L.
 
 
 9
 As to the several elements required to be established in a Section 549 proceeding the parties had stipulated that a transfer of funds had taken place, that the transfer was made after the bankruptcy action was started, and that there was no order by the Bankruptcy Court authorizing the transfer. The issue or element which was not stipulated was whether or not the funds were the "property" of the estate. 11 U.S.C. Sec. 549 provides that "the trustee may avoid a transfer of property of the estate ... that occurs after the commencement of the case...." See also Section 541.
 
 
 10
 Appellant argued in Bankruptcy and District Court, and now contends on appeal, that the funds transferred were never "property of the estate" and thus were not recoverable under Section 549. Appellant advances authority which clearly states that the recipient of property obtained by fraud does not actually acquire title to it. See e.g. In re North American Coin & Currency, Ltd., 767 F.2d 1573, 1576 (9th Cir.1985); In re Teltronics, Ltd., 649 F.2d 1236, 1239 (7th Cir.1981); In re Paragon Securities Company, 589 F.2d 1240, 1242 (3d Cir.1978). Thus, Appellant maintains that because title was not obtained by the Debtor, the transferred funds could not have been estate property, and consequently are not recoverable under Section 549.
 
 
 11
 As the District Court succinctly stated, Appellant's "argument is correct as far as it goes." The flaw in Appellant's approach is that the weight of the authority, which recognizes that property acquired fraudulently does not pass with title, also provides that a claimant must be able to identify or trace the fraudulently deprived funds or property to which he claims ownership. See In re Mark Benskin & Co., 161 B.R. 644, 653-56 (Bankr.W.D.Tenn.1993); In re Stotler & Co., 144 B.R. 385, 390-92 (Bankr.N.D.Ill.1992); In re Iorizzo, 114 B.R. 19, 24 (Bankr.E.D.N.Y.1990); In re Universal Clearing House, 62 B.R. 118, 122-24 (Bankr.D.Utah 1986).
 
 
 12
 This requirement is not new, and actually was set forth in the original Ponzi scheme Supreme Court case, Cunningham v. Brown, mentioned above. The Supreme Court in that case held that if claimants are able to trace the funds fraudulently acquired by the debtor then those claimants "would have been endeavoring to get their own money, and not money in the estate of the bankrupt." Cunningham, 265 U.S. at 11, 44 S.Ct. at 426. The court went on to state that "to succeed they must trace the money and therein they have failed." Id.
 
 
 13
 Similarly, Youth Benefits Unlimited did not demonstrate that it is able to trace the funds it invested in the Debtor and really did not attempt to do so. To allow Appellant the recovery of an amount equal to that it invested would give it an obvious preference over other creditors who lost their investments in precisely the same fraudulent manner as Appellant. As the Supreme Court stated in 1901:
 
 
 14
 "It is hardly necessary to assert that the object of a bankrupt act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt--not among some of the creditors, but among all of them."
 
 
 15
 Pirie v. Chicago Title and Trust Company, 182 U.S. 438, 449, 21 S.Ct. 906, 910, 45 L.Ed. 1171 (1901). Such object is undermined where property fraudulently deprived from one party is repaid at the expense of others similarly deprived.
 
 
 16
 The requirement that a defrauded party trace its lost assets does not undermine the purpose of the general rule that property fraudulently obtained is not property of the estate. This rule is based upon the desire to prevent certain creditors from benefitting from the debtor's fraud at the expense of those defrauded. In re North American Coin & Currency, Ltd., 767 F.2d at 1576. Thus, where fraudulently obtained assets are held by the debtor but are readily distinguishable from assets to which general creditors have a claim, it is proper to return the property to the defrauded party rather than distribute it through the estate, which of course seeks to distribute assets equitably among all creditors or as many as possible. In a Ponzi scheme, or other scenario where creditors are almost exclusively defrauded parties, there is no distinguishing characteristic which promotes the interests of one over the other. Consequently, absent direct identification of the defrauded funds, it is to the detriment of all other similarly situated creditors to favor one defrauded party over another.
 
 Jury Trial
 
 17
 Appellant argues that the District Court erred in determining that the Appellee's claims against Youth Benefits were equitable in nature and accordingly did not provide Youth Benefits a right to a jury trial. Appellant filed its Demand for Jury Trial and Motion for Withdrawal of the Reference and Transfer to the United States District Court on October 7, 1991. The District Court denied the motion, and trial was conducted to the Bankruptcy Court.
 
 
 18
 Appellant asserts that it is entitled to a jury trial under the test of Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), whereby courts look to whether the action would have been one at law or equity in the Eighteenth Century courts of England, whether the nature of the relief is primarily legal or equitable, or whether the action is one that is not equitable in nature but which Congress has assigned to a non-Article III adjudicative body. Id. at 42, 109 S.Ct. at 2790. We conclude that enforcement of Section 549, a provision clearly designed to protect the bankruptcy estate following its inception, is a procedure which is equitable in nature. See In re Blinder, Robinson & Co., Inc., 146 B.R. 28 (Bankr.D.Colo.1992); In re North Carolina Hospital Association Trust Fund, 112 B.R. 759 (Bankr.E.D.N.C.1990). Moreover, through the Bankruptcy Act Congress has established that the Bankruptcy Court is the tribunal in which the protection of that estate is accomplished, and in which disputes may be resolved by way of summary proceedings. There is no underlying legal claim in this case, such as one to recover an alleged fraudulent conveyance, which warrants a contrary result. See Granfinanciera, 492 U.S. at 64, 109 S.Ct. at 2802. We thus agree with the Colorado District Court in its ruling prior to trial to the Bankruptcy Court that there is no right to trial by jury in a trustee's Section 549 claim for recovery of a post-petition transfer.
 
 
 19
 For the foregoing reasons, the judgment of the District Court is AFFIRMED.