BRORBY, Circuit Judge.
This ease arises out of an elaborate and long-running Ponzi scheme.[1] As with all Ponzi schemes, this one collapsed and left many innocent investors with significant losses. The scheme was masterminded and operated by a man named James Donahue, whom a federal district court sentenced to federal prison for his role in the debacle. In his operation of the scheme, Mr. Donahue utilized a solely-owned corporation and three limited partnerships. The corporation served as the managing general partner of the three limited partnerships. The innocent investors in the scheme purportedly purchased limited partnership interests in the partnerships. Now that the scheme has collapsed, the corporation and the three limited partnerships are in bankruptcy under Chapter 7 of Title 11 of the United States Code.
Harvey Sender is the trustee in bankruptcy for the four bankrupt entities. William Simon and the Baker Family Partnership I (the “Baker Partnership”) find themselves among what Mr. Sender calls the “lucky” group of innocent investors who managed to withdraw more money from the Ponzi scheme than they put into it. Mr. Sender has sued Mr. Simon and the Baker Partnership under Colorado partnership law to recover the money they received in excess of the money they contributed. Mr. Sender claims the excess payments represent fictitious profits to which the defendants are not entitled.
The district court entered summary judgment for Mr. Simon and the Baker Partnership after concluding the partnership agreements are not enforceable. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court.
I. Background
In the late 1970s, Mr. Donahue formed a corporation named Hedged-Investments Associates, Inc. (“HIA Inc.”) for the purpose of operating an investment fund known generally as Hedged Investments. Mr. Donahue attracted investors to the fund by claiming he had developed a sophisticated, computer-based strategy for trading in hedged securities options. He boasted annual returns of fifteen to twenty-two percent. When an individual agreed to invest in the fund, Mr. Donahue purported to sell him or her limited partnership interests in one of three limited partnerships: Hedged-Investments Associates, L.P. (“HIA L.P.”), Hedged-Investments Associates II, L.P. (“HIA II L.P.”), and Hedged-Securities Associates, L.P. (“HSA L.P.”) (collectively the “Debtor Partnerships”).[2] HIA Inc. served as the managing general partner for each of the Debtor Partnerships. According to Mr. Donahue’s representations, HIA Inc. would take the money invested in the partnerships and invest it in the Hedged Investments fund according to his trading strategies.
Mr. Donahue failed to maintain separate accounting records for the Debtor Partnerships and commingled investors’ funds into a single checking account held in the name of HIA Inc. Though he maintained no records for the partnerships themselves, Mr. Donahue did establish individual investor accounts through HIA Inc. that allowed each investor to know the putative status of her or his investment in the Hedged Investments fund. In other words, Mr. Donahue treated , the *1302 investors as if they were direct participants in a single investment pool instead of investors in discreet limited partnerships.
Mr. Donahue used invested funds to trade in securities options over the life of the operation, and his trading resulted in net profits in a few years, including 1989. However, in most years the Hedged Investments operation realized net trading losses, and in all years Mr. Donahue substantially overstated the fund’s performance. From 1982 onward the fund was insolvent in that its cumulative losses exceeded its cumulative gains. To prevent investors from discovering the fund’s poor performance, Mr. Donahue falsely reported high earnings. When an investor sought to withdraw money from his account on the basis of these reported earnings, Mr. Donahue — because the fund had no real cumulative earnings — apparently paid the withdrawal from the capital contributions of other investors.
The Hedged Investments operation collapsed in the summer of 1990. On August 30, 1990, Mr. Donahue caused HIA Inc. to file for voluntary bankruptcy pursuant to Chapter 11 of Title 11 of the United States Code. On September 7, 1990, the case was converted to a Chapter 7 bankruptcy, and the bankruptcy court appointed Mr. Sender as trustee for the estate of HIA Inc. On October 3, 1990, Mr. Sender, as trustee for HIA Inc., filed involuntary petitions for bankruptcy under Chapter 7 against the Debtor Partnerships. The bankruptcy court then appointed Mr. Sender as the trustee for the Debtor Partnerships and ordered the Debtor Partnerships’ estates to be jointly administered with the HIA Inc. estate. On September 30, 1991, apparently because Mr. Donahue commingled partnership funds and generally disregarded the separate identity of each of the Debtor Partnerships, the bankruptcy court substantively consolidated the Debtor Partnerships for the purpose of administering the bankruptcy estate. According to Mr. Sender’s financial expert, a reconstruction of each of the Debtor Partnerships, while possible, would have been impractical and unnecessary. Since all the investor contributions were commingled into a single investment fund, the value of each investor’s account was determined by her or his pro rata share of the commingled fund — a valuation that would not change with a reconstruction of each Debtor Partnership.
Mr. Simon and the Baker Partnership both invested in the Hedged Investments fund through HSA L.P., a limited partnership formed under the Colorado Uniform Limited Partnership Act of 1981. Mr. Simon’s relationship with HSA L.P. began in June 1988, when he executed a document entitled “Certificate and Articles of Limited Partnership for Hedged Securities Associates” and transferred $5 million into the Hedged Investments fund. This amount was his sole contribution to the fund. The Baker Partnership’s relationship with HSA L.P. began in January 1989, when the managing partner of Baker executed a “Certificate and Articles of Limited Partnership for Hedged Securities Associates” and caused Baker to transfer $1.7 million into the Hedged Investments fund. Like Mr. Simon, this amount was the Baker Partnership’s sole contribution to the fund. Mr. Simon’s and the Baker Partnership’s investment relationships with the Hedged Investment fund ended in August 1989, when each received lump sum checks signed by Mr. Donahue and drawn on a checking account held by “Hedged-Investment- Assoc., Inc. III.” Notations on the two checks indicated they were intended to terminate the “capital” accounts of Mr. Simon and the Baker Partnership. Mr. Simon received $6,220,957.86, which was $1,220,957.86 more than his original contribution. The Baker Partnership received $1,916,366.23, which was $236,366.23 more than its original contribution. The amounts in excess of the defendants’ contributions apparently represented earnings that had been allocated to their accounts during their participation in the Hedged Investments fund. Aside from the lump sum payments, neither defendant received any other distributions from HSA L.P.
In December 1992, Mr. Sender brought separate suits in Colorado District Court, Arapahoe County, against Mr. Simon and the Baker Partnership. Mr. Sender’s complaint in both cases alleged, inter alia, Mr. Simon and the Baker Partnership “received distri- *1303 buttons in excess of their contribution” in violation of § 608(2) of the Colorado Uniform Limited Partnership Act of 1981, Colo.Rev. Stat. § 7-62-101, et seq. (“CULPA”).[3] Accordingly, Mr. Sender claimed the bankruptcy estate was “entitled to the return of the [excess distributions].” As already noted, Mr. Simon and the Baker Partnership received, respectively, $1,220,957.86 and $236,-366.23, in excess of their contributions to the Hedged Investments fund.
In March 1993, Mr. Simon and the Baker Partnership, represented by the same counsel, removed the eases to the District Court for the District of Colorado, basing jurisdiction on diversity of citizenship. See 28 U.S.C. § 1332. The two actions were consolidated in June 1993. The district court decided the case on cross motions for summary judgment, granting summary judgment in favor of Mr. Simon and the Baker Partnership after determining the partnership agreements were not enforceable. Mr. Sender appealed.
II. Applicable Law & Standard of Review
The district court’s jurisdiction over this ease was based on diversity of citizenship under 28 U.S.C. § 1332. “A federal court sitting in diversity applies the substantive law ... of the forum state.” Barrett v. Tallon, 30 F.3d 1296, 1300 (10th Cir.1994). Mr. Sender brought this suit under the substantive law of Colorado, and, as neither party disputes, Colorado is the forum state in this matter. Therefore, to the extent Colorado law governs this case,[4] we are bound by the most recent statements of Colorado law by the Colorado Supreme Court. Wood v. Eli Lilly & Co., 38 F.3d 510, 513 (10th Cir.1994). In the event “no state cases exist on a point, we turn to other ‘state court decisions, federal decisions, and the general weight and trend of authority.’ ” Barnard v. Fireman’s Fund Ins. Co., 996 F.2d 246, 248 (10th Cir.1993) (quoting Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir.1988)). However, in a diversity action, “as a matter of independent federal procedure, we utilize the normal federal standards of appellate review to examine the district court’s decision process.” Mid-America Pipeline Co. v. Lario Enters., Inc., 942 F.2d 1519, 1524 (10th Cir.1991).
We review the grant or denial of a motion for summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir.1994). Summary judgment is appropriate when the district court record “ ‘show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.’ ” Universal Money Ctrs. Inc. v. AT & T Co., 22 F.3d 1527, 1529 (10th Cir.) (quoting Fed.R.Civ.P. 56(c)), cert. denied, — U.S. -, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). If no genuine issue of material fact is in dispute, we determine whether the substantive law requires judgment for the moving party. Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir.1995) (citing Applied Genetics Int’l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir.1990)).
III. Discussion
A. Mr. Sender’s Standing
We begin our analysis of Mr. Sender’s appeal with an evaluation of his standing *1304 to bring the claims he asserts. Mr. Sender, in his capacity as trustee in bankruptcy for the debtor estates, must draw his authority to assert a particular cause of action from some provision within Title 11 of the United States Code. Causes of action commenced by a trustee on behalf of a debtor estate fall into two broad categories: (1) actions brought by the trustee as successor to the debtor’s interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee’s avoidance powers. 2 Collier on Bankruptcy ¶ 323.02[4], at 323-10. Though Mr. Sender’s complaints against the defendants did not address the issue of his capacity to bring his state law claims, his brief to this court asserts, “the actions ... are brought by [the] bankruptcy trustee utilizing his statutory powers under 11 U.S.C. § 544.” Because § 544 gives a trustee certain avoidance powers, actions brought under the section fall within the second category of types of trustee actions. To the extent Mr. Sender relies on § 544 for his authority to bring the claims he asserts, his reliance is misplaced.
Section 544 is divided into two subsections: 544(a) and 544(b). Mr. Sender has not indicated which of these subsections he attempts to invoke. Section 544(a) gives the trustee the power, as of the commencement of the bankruptcy case, to avoid transfers and obligations of the debtor to the same extent as certain hypothetical ideal creditors. See 11 U.S.C. § 544(a) (giving the trustee the same avoidance powers as (1) a judicial lien creditor, (2) a creditor holding an execution returned unsatisfied, or (3) a bona fide purchaser of real property, whether or not such creditors or purchaser exist). Mr. Sender makes no claims against the defendants available under 544(a). We therefore construe his invocation of § 544 as a reference to subsection (b).
Under § 544(b), a “trustee may avoid any transfer of an interest of the debt- or ... that is voidable under applicable law by a[n] [unsecured] creditor.” 11 U.S.C. § 544(b). Subsection (b) contains no substantive provisions indicating what transfers or obligations are avoidable. The trustee’s powers under the section are predicated on the non-bankruptcy law, usually state law, applicable to the transaction sought to be avoided. See Dicello v. Jenkins (In re International Loan Network, Inc.), 160 B.R. 1, 17-18 (Bankr.D.D.C.1993). Before asserting applicable state law, however, the trustee “must first show that there is an actual creditor holding an allowable unsecured claim ... who, under [state] law, could avoid the transfers in question.” Id. at 18; see also Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 863 n. 30 (D.Utah 1987). See generally 4 Collier on Bankruptcy ¶ 544.03. In other words, “[i]f there are not creditors within the terms of section 544(b) against whom the transfer is voidable under the applicable law, the trustee is powerless to act so far as section 544(b) is concerned.” 4 Collier on Bankruptcy ¶ 544.03[1], at 544-18.
Mr. Sender has not met § 544(b)’s requirements. Mr. Sender’s brief repeatedly emphasizes he is pursuing claims of the partnership itself, not claims that belong to creditors of the partnership. Indeed, it does not seem the state law on which he relies would allow it any other way. The partnership law under which Mr. Sender is proceeding provides that when a partner receives “the return of any part of his contribution in violation of the partnership agreement or this article, he is hable to the limited partnership.” Colo.Rev. Stat. § 7-62-608(2) (emphasis added). If Mr. Sender is bringing claims belonging to HSA L.P. itself, we fail to see how he can satisfy § 544(b)’s requirements that he establish the existence of an actual unsecured creditor who could avoid the challenged transactions under the applicable law. The applicable law in this case is, by Mr. Sender’s own decision, a certain section of CULPA, and Mr. Sender has not pointed to any creditors of HSA L.P. who would have causes of action against Mr. Simon or the Baker Partnership under that section. The cause of action he pursues belongs to the debtor partnership itself, not the partnership’s creditors.
That Mr. Sender asserts a cause of action not authorized by § 544(b) does not necessarily render him powerless to bring it. Under 11 U.S.C. § 541(a)(1), the bankruptcy estate includes, except as otherwise provided, “all legal or equitable interests of the debtor *1305 in property as of the commencement of the case.” This definition includes causes of action belonging to the debtor at the commencement of the bankruptcy case. Mixon v. Anderson (In re Ozark Restaurant Equip. Co.), 816 F.2d 1222, 1225 (8th Cir.), cert. denied, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); see Delgado Oil Co. v. Torres, 785 F.2d 857, 860 (10th Cir.1986) (debtor corporation’s estate includes any right of action debtor corporation has against corporate officers or directors); H.R.Rep. No. 595, 95th Cong., 1st Sess. 367, reprinted in 1978 U.S.C.C.A.N. 5963, 6323 (under § 541 debtor estate “will include choses in action and claims by the debtor against others”). Importantly, to satisfy the requirements of § 541, the cause of action asserted by the trustee must belong to the debtor entity itself, not the debtor’s creditors individually.[5] Mixon, 816 F.2d at 1225; see Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.), 785 F.2d 1249, 1254 (5th Cir.1986); 4 Collier on Bankruptcy ¶ 541.10. State law provides the guidelines for determining whether a cause of action belongs to the debtor and therefore becomes property of the estate. Mixon, 816 F.2d at 1225; Zimmerman v. Starnes, 35 B.R. 1018, 1020 (D.Colo.1984) (citing Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). Mr. Sender’s claims against Mr. Simon and the Baker Partnership satisfy these requirements. As noted in the previous discussion of 11 U.S.C. § 544(b), the section of CULPA on which Mr. Sender relies makes limited partners “liable to the limited partnership.” Colo. Rev.Stat. § 7-62-608(2). Under Colorado law, it seems clear Mr. Sender’s cause of action belongs to the partnership itself and is therefore included as property of the debtor estate within the meaning of 11 U.S.C. § 541. Because the cause of action is property of the estate, Mr. Sender, as trustee of the estate, has standing to pursue it on the estate’s behalf. Mixon, 816 F.2d at 1225.
When asserting claims under the authority of 11 U.S.C. § 541, as Mr. Sender does in this case, the trustee stands in the shoes of the debtor and “can take no greater rights than the debtor himself had.” H.R.Rep. No. 595, 95th Cong., 1st Sess. 368, reprinted in 1978 U.S.C.C.A.N. 5963, 6323. This means the trustee is “ ‘subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debt- or.’ ” Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir.1989) (quoting 2 Collier on Bankruptcy ¶ 323.02[4]); see also W.F. Pigg & Son, Inc. v. United States, 81 F.2d 334, 335 (10th Cir.1936) (“The trustee takes subject to all valid claims, liens, and equities which might have been asserted against the bankrupt.”) (interpreting Section 70a of the Bankruptcy Act, the predecessor of 11 U.S.C. § 541). In other words, though this case is brought by a bankruptcy trustee who gains his authority to sue from the United States Bankruptcy Code, Mr. Sender’s success or failure on the merits is determined as if the debtor entity itself brought the claims at issue under the applicable law. Accordingly, we now turn to Mr. Sender’s contentions under CULPA.
B. Mr. Sender’s Claims
Mr. Sender contends the defendants received payments, as limited partners of HSA L.P.,[6] in violation of CULPA. CULPA applies “to all limited partnerships formed on or after November 1, 1981,” Colo.Rev.Stat. § 7-62-1101, and therefore applies to HSA L.P., which was formed in December 1984. Mr. Sender’s claims against Mr. Simon and the Baker Partnership rely specifically on Colo.Rev.Stat. § 7-62-608(2), which provides:
If a partner has received the return of any part of his contribution in violation of the partnership agreement or this article, he is hable to the limited partnership for a period of six years thereafter for the *1306 amount of the contribution wrongfully returned.
Mr. Sender contends the defendants received “wrongfully returned” contributions under § 608(2) in both senses contemplated by the section. First, he claims Mr. Simon and the Baker Partnership received payments in violation of the partnership agreement.[7] Second, Mr. Sender claims the defendants received payments in violation of § 607 of CULPA. See Colo.Rev.Stat. § 7-62-607.[8]
Mr. Simon and the Baker Partnership offer several alternative reasons why they should not be held hable on Mr. Sender’s claims. First, Mr. Simon and the Baker Partnership invoke the defense of fraud and argue the Partnership Agreement was void ab initio and unenforceable. Second, the defendants contend they were never limited partners in HSA L.P. and are therefore not subject to claims under CULPA. Third, they claim that even if they are subject to claims brought under CULPA, they nevertheless, as a matter of law, cannot be found hable under § 608(2) of that act. Fourth, Mr. Simon and the Baker Partnership assert that if they are liable on the claims brought by Mr. Sender they are nevertheless entitled to recoupment or setoff.
The district court granted the defendants’ motion for summary judgment on the basis of their fraud defense. According to the district court, the limited partnership Mr. Simon and the Baker Partnership purportedly joined was merely a fraudulent arrangement used to carry on a Ponzi scheme. The putative partnership never represented “a legitimate contract between consenting parties” and therefore a valid partnership never existed to give rise to the provisions of CUL-PA.
For slightly different reasons than those relied on by the district court, we reach the same result. Before embarking upon our analysis, it is important to emphasize two points on which we have already touched. First, Mr. Sender relies exclusively on provisions in CULPA; he has pursued no other legal or equitable claims that might be available under Colorado law. Accordingly, the success of his claims depends on a threshold demonstration that Mr. Simon and the Baker Partnership entered into valid and enforceable partnership agreements that give rise to *1307 CULPA’s provisions. Second, in his capacity as a bankruptcy trustee bringing causes of action pursuant to 11 U.S.C. § 541, Mr. Sender stands in the shoes of the bankrupt partnership and has no greater rights than the partnership had as of the bankruptcy filing. 11 U.S.C. § 541(a)(1) (limiting estate to the debtor’s interests in property “as of the commencement of the case”); Hays & Co., 885 F.2d at 1154 n. 7. With these principles in mind, we turn to Mr. Sender’s claims against the defendants.
As other courts have recognized in the context of Ponzi schemes, courts generally will not enforce an illegal contract based upon “‘the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.’” Merrill v. Abbott, 77 B.R. at 857 (quoting Gibbs & Sterrett Mfg. Co. v. Brucker, 111 U.S. 597, 601, 4 S.Ct. 572, 574, 28 L.Ed. 534 (1884)); Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 441 (Bankr.N.D.Ill.1995) (same quote). This rule is not reserved for contracts that are illegal on the basis of their subject matter, e.g., a contract to manufacture illicit narcotics.
“A bargain may be illegal by reason of the wrongful purpose of one or both of the parties making it. This is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable. A party who makes such a bargain in furtherance of his wrongful purpose can not enforce it....”
Tri-Q, Inc. v. Sta-Hi Corp., 63 Cal.2d 199, 45 Cal.Rptr. 878, 890, 404 P.2d 486, 498 (1965) (quoting 6A Corbin on Contracts § 1518, at 744 (1962)).
As Mr. Sender has conceded, Mr. Donahue operated an illegal Ponzi scheme and was sentenced to federal prison upon being convicted of securities fraud. Though it is not clear whether Mr. Donahue intended to run a Ponzi scheme from the moment he began Hedged Investments in the late 1970s, Mr. Sender concedes the operation “never made the returns” it reported and would have collapsed absent new funds being invested. Neither does Mr. Sender dispute that Mr. Donahue created the Debtor Partnerships “as vehicles for persons to invest with him.” According to the conclusions of Mr. Sender’s accounting expert, “[t]he purported annual returns set forth in ... the partnership tax returns as filed were completely fictitious.” Notwithstanding the representations made to investors, the Debtor Partnerships were insolvent as of 1982.
Though the Debtor Partnerships were not illegal per se, it is beyond peradventure they were created and operated in furtherance of a fraudulent and illegal investment scheme. To the extent HSA L.P. was created as a vehicle to further the Ponzi scheme and utilized to give the scheme a veneer of legitimacy, it was in utter complicity with Mr. Donahue’s fraud. HSA L.P., acting through Mr. Donahue and HIA Inc., fraudulently induced the participation of Mr. Simon and the Baker Partnership in the scheme by misrepresenting both the true nature of the Hedged Investments fund and the partnership’s role in perpetuation of the fraud. In other words, with regard to its interactions with Mr. Simon and the Baker Partnership, HSA L.P.’s purpose was an illegal one. It furthered this illegal purpose by fraudulently inducing Mr. Simon and the Baker Partnership to execute the partnership agreements.
Mr. Sender, standing in the shoes of HSA L.P., now seeks to enforce the partnership agreements against Mr. Simon and the Baker Partnership. Following the suggestions of our fellow jurists, this court will not aid in the enforcement of an agreement that was fraudulently procured in furtherance of an illegal purpose. See Merrill, 77 B.R. at 857; Tri-Q, 45 Cal.Rptr. at 890, 404 P.2d at 498. That Mr. Sender acts as a trustee in bankruptcy cannot lend strength to the partnership’s position. The question is whether the partnership could have succeeded on its claims before it entered bankruptcy, and the answer to that question is clearly no.
Mr. Sender contends HSA L.P. was not an illegal partnership, and in support of this contention points us to the language of the partnership agreement. Mr. Sender correctly observes: “There is nothing in the stated *1308 purposes of the Partnership Agreement which violates any statute or the common law, there was no failure to obtain a required license and further there is nothing on the face of the Partnership Agreement reflecting that the partnership is to be operated as a fraud.” Mr. Sender insists that since an options trading business is not an unlawful enterprise, HSA L.P., which was created for the putative purpose of running such a business, cannot be an illegal partnership. Mr. Sender’s argument ignores the reality of HSA L.P.’s existence. Obviously, the language of the agreement did not indicate the partnership actually operated as a vehicle for fraud. That is the point; the partnership and its agreement helped endow the scheme with a fagade of legitimacy. As we have already established, a bargain may be illegal by reason of the wrongful purpose of one or both of the parties making it. This axiom is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable. Such is the case with HSA L.P.
Mr. Sender also tries to immunize HSA L.P. from illegality by contending Mr. Donahue’s illegal acts and purposes cannot be attributed to the partnership. He argues a limited partnership may not be held responsible or hable for the wrongful conduct of a general partner unless the conduct is “within the ordinary course of the partnership’s business or is done with the authority of the other partners.” In support of this contention, Mr. Sender cites Colo.Rev.Stat. § 7-60-113, which provides:
Partner’s wrongful acts — liability.
Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.
As the language of this statute makes clear, the rule on which Mr. Sender relies applies only when “loss or injury is caused to any person, not being a partner in the partnership.” (Emphasis added.) Also, the cases he cites in support of his position each involve injury to third parties, not other partners. See, e.g., Courts of the Phoenix v. Charter Oak Fire Ins. Co., 560 F.Supp. 858 (N.D.Ill.1983); Wales v. Roll, 769 P.2d 899 (Wyo.1989); see also Williams v. Burns, 463 F.Supp. 1278 (D.Colo.1979). They do not involve the situation where a limited partnership, acting through its managing general partner, has fraudulently induced an innocent investor to participate in a Ponzi scheme. In our ease, HSA L.P. held itself out to Mr. Simon and the Baker Partnership as a legitimate component of a legitimate investment opportunity. Once Mr. Simon and the Baker Partnership joined HSA L.P. as limited partners, the partnership encouraged them to remain partners by reporting fictitious earnings. When, by prudence or luck, they sought to leave the partnership, HSA L.P. continued the fiction by paying them unrealized profits. To say the fraudulent intent originated in Mr. Donahue merely recognizes that HSA L.P. acted exclusively through Mr. Donahue as sole shareholder of HIA Inc., HSA L.P.’s managing general partner. Focusing on Mr. Donahue as the source of wrongdoing does nothing to change the fact that fraud and illegality permeated every aspect of HSA L.P.’s relationship with Mr. Simon and the Baker Partnership. Mr. Sender now asks us to brush aside the pervasive illegality of HSA L.P.’s relationship with Mr. Simon and the Baker Partnership and focus on the facially valid partnership agreements. We refuse.
In conclusion, this court will not aid the effort of a fraudulent entity that used the trappings of legal formality to lure its victims to turn around and try to hold its victims accountable under those same legal formalities. Though our reasoning parallels that of the district court in certain respects, we would like to emphasize that, unlike the district court, we are not declaring the partnership agreements void ab initio. As one court explained:
‘While it is frequently asserted that an illegal bargain is void, meaning thereby, presumably, that the situation is just as if no contract had been made, this is not *1309 strictly so. What the courts really have done, in such cases, in the absence of a statute specifying otherwise, is to take the view merely that the judicial machinery is not available for use to one who has participated in an illegal transaction.”
Kermath Mfg. Co. v. Brownell, 222 F.2d 577, 580 (6th Cir.) (quoting Grismore’s Law of Contracts § 290), cert. denied, 350 U.S. 843, 76 S.Ct. 84, 100 L.Ed. 752 (1955); see also Smithy Braedon Co. v. Hadid, 825 F.2d 787, 790 n. 4 (4th Cir.1987) (noting with approval Williston’s and Corbin’s efforts “to inter the proposition that illegal contracts are Void’ ab initio”).
We would also like to make clear that nothing we say in this opinion should be seen as affecting the rights of trustees like Mr. Sender who bring actions under other theories of state law. We understand Mr. Sender is only trying to maximize the value of the debtor entities in the interest of mitigating other investors’ losses. Though his goals and zeal are laudable, we cannot endorse his means.
The district court’s grant of summary judgment in favor of Mr. Simon and the Baker Partnership is AFFIRMED.

. A Ponzi scheme is a fraudulent investment scheme in which “profits" to investors are not created by the success of the underlying business venture but instead are derived from the capital contributions of subsequently attracted investors. Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs., Inc.), 48 F.3d 470, 471 n. 2 (10th Cir.1995). For an Informative discussion of Ponzi schemes and their namesake, Charles Ponzi, see Merrill v. Abbott (In re Independent Clearing House Co.), 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984).

. In some cases, as with the Baker Partnership, investors joined in sub-partnerships that in turn invested in one of the Debtor Partnerships.

. Mr. Sender's complaint cited Colo.Rev.Stat. §§ 7-62-608(2) and 7-62-607 as the bases for his claims. Section 608 makes a partner liable to the partnership for any return of his contribution in violation of the partnership agreement or CULPA. Mr. Sender's brief clearly indicates his intention to rely on § 608(2) as his grounds for bringing his claim under § 607, a section which places certain restrictions on distributions to partners. In this sense, Mr. Sender's § 607 claim relies on the applicability of § 608. Therefore, when referring to Mr. Sender’s theory of recovery, we describe it as a claim under Colo. Rev.Stat. § 7-62-608(2). Mr. Sender alleged alternative grounds for relief against the Baker Partnership under Colo. Rev.Stat. §§ 7-61-117 and 7-61-118, but those claims were later withdrawn. (Ape. Br. at 3 n. 3.) The two complaints also named the Frank Russell Company as a defendant, but this defendant was subsequently dismissed from the suits by stipulation of the parties.

. As we discuss below, Mr. Sender’s standing to sue in this case is a question of federal law under the Bankruptcy Code.

. In this respect, sections 541 and 544(b) of the Bankruptcy Code are mirror images of one another. When the trustee proceeds on a state claim under the former, the cause of action must belong to the debtor itself, but under the latter, the cause of action must belong to an actual creditor of the debtor.

. Mr. Simon and the Baker Partnership contend they never became limited partners in HSA L.P. Our language above is not meant to suggest they actually did become limited partners; we are merely articulating Mr. Sender’s position.

. In support of this contention, Mr. Sender cites four provisions of the HSA L.P. partnership agreement:
6.1 Allocation of Net Revenues Among Partners. As of the end of each year, the net revenues shall be divided eighty percent (80%) to the Partners to be distributed in accordance with their allocation percentages in the Partnership and the remaining twenty percent (20%) to the General Partners.
6.3 Allocation of Costs and Expenditures. All the general and administrative costs, offering costs and all others costs and expenses of operations of the Partnership shall he paid by the General Partners. Losses to the Partnership shall be allocated to and borne by the General Partners to the extent of the Escrow Account. Upon exhaustion of the Escrow Account, the losses will be borne by the Partners in accordance with their allocation percentages.
12.1 Closing of Purchase. Upon receipt of a 90-day written notice from a Limited Partner directing that the Partnership purchase his Interests, the Managing General Partner shall set a date within 10 days of the end of the next calendar quarter as the closing date for the purchase of such Interests. On the closing date the Partnership shall pay the Limited Partner an amount equal to the unreturned capital of such Limited Partner on the preceding January 1, plus a return on such capital based on the estimated rate of return for the year of redemption pro rated to the closing date, and the Limited Partner shall assign his interest to the Partnership.
12.3 Capital Account Withdrawals and Additions. Additions and withdrawals to Limited Partner capital accounts may be made in the first ten days of any fiscal period in whole or partial increments of Interest ($5,000). Each Limited Partner shall have the right to withdraw out of his capital account any amounts up to the redemption value of his account. Thirty days (30) of notice of intention to withdraw funds from a capital account must be submitted in writing to the General Partners by the Limited Partners. This notice must be received by the Managing General Partner not later than thirty days (30) prior to the last day of the fiscal period.

. Colo.Rev.Stat. § 7-62-607 provides:
A partner may not receive a distribution from a limited partnership to the extent that, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests, exceed the fair value of the partnership assets.