**In re JD SERVICES, INC., Debtor.**

No. 00–29460.

United States Bankruptcy Court,
D. Utah.

July 30, 2002.

Joel T. Marker, McKay, Burton & Thurman, Mona Lyman Burton, Holland & Hart, Salt Lake City, UT, for debtor.

Kenneth L. Cannon, II, LeBoeuf, Lamb, Greene & MacRae, R. Kimball Mosier, Parsons, Davies, Kinghorn & Peters, Salt Lake City, UT, trustee.

## ORDER DIRECTING RETURN OF FUNDS AND ALLOWING ADMINISTRATIVE PRIORITY CLAIM

GLEN E. CLARK, Chief Judge.

This matter came before the Court on April 9, 2002, on the "Motion for Summary Judgment Regarding Recovery of Funds Received as a Result of Bank Encoding Error" filed by Bank of America, N.A. R. David Grant appeared on behalf of Bank of America, N.A. R. Kimball Mosier appeared on behalf of the Chapter 7 Trustee.

### UNDISPUTED FACTS

1. On August 24, 2000, the Debtor filed its voluntary petition commencing this case under Chapter 11 of the Bankruptcy Code.

2. On August 28, 2000, Lone Star Prepaid Inc. ("Lone Star"), a subsidiary of the Debtor, deposited a check in the amount of $7,250.00 into account number 0016–3224–5892 at Bank of America in Texas. Bank of America (the "Bank") gave immediate credit for the check.

3. At the time of accepting the deposit, the check and deposit were improperly encoded by the Bank for $725,000.00 rather than $7,250.00.

4. On August 28, 2000, the Debtor opened an account, account number 222–00087–06 (the "Account") at First Security Bank of Utah, N.A. ("First Security").

5. On August 30, 2000, Debra W. Ricks, an owner of the Debtor, initiated a wire transfer from Lone Star account number 0016–3224–5892 to the Account at First Security in the amount of $800,000.00.

6. Of the $800,000.00 sent by wire transfer from Lone Star to the Account at First Security, $717,750.00 (the "Disputed Funds") did not belong to Lone Star, but was erroneously transferred to the Debtor account at First Security as a result of the above-described encoding error.

7. Each day beginning August 28, 2000, the Debtor deposited funds into the Account, some in the form of cash deposits, some in the form of wire transfers, some in the form of official checks, money orders or checks written on other First Security accounts (and similar items), and some in the form of local checks as defined in 12 C.F.R. § 229.2(r) (2001), and some in the form of non-local checks as defined in 12 C.F.R. § 229.2(v) (2001).

8. Prior to September 1, 2000, deposits to the Account by the Debtor in the form of cash deposits and in the form of wire transfers, official checks, money orders or checks written on other First Security accounts (and similar items) were immediately available for withdrawal by the Debtor.

9. First Security was not immediately informed that the Debtor was in bankruptcy when the Debtor opened the Account, and First Security did not impose any extraordinary holds for local and non-local checks deposited into the Account when the account was opened.

10. On or about September 1, 2000, as a result of several checks being returned to First Security unpaid as a result of insufficient funds or stop payment orders on checks previously deposited into the Account, First Security imposed a longer hold on the Account for local and non-local checks deposited into the account.

11. For local checks deposited by the Debtor to the Account, First Security only made the funds available for withdrawal by the Debtor seven business days after deposit.

12. For non-local checks deposited by the Debtor, First Security only made the funds available for withdrawal by the Debtor eleven business days after deposit.

13. Stephen Austin Hansen ("Hansen"), the First Security branch manager in charge of the Account, believed that the holds of seven and eleven business days placed on the

Account were the longest holds allowed under the federal banking regulations.

14. On September 5, 2000, Bank of America notified the Debtor that it had erroneously credited the Lone Star account for $725,000.00 on a deposit of $7,250.00 and that the Debtor received $717,750.00 that did not belong to the Debtor as part of the August 30, 2000, wire transfer.

15. Bank of America demanded return of the Disputed Funds received in error by the Debtor by letter dated September 6, 2000.

16. On or before September 8, 2000, First Security put an administrative freeze on the Account that required Hansen to designate which checks or other items were being paid from the Account, and allowed him to review any deposits to the Account.

17. On September 13, 2000, the Debtor and First Security agreed to placing a hold on the Account in the amount of $717,750.00.

18. Between August 24, 2000, the petition date, and September 13, 2000, the Debtor, as a Chapter 11 debtor-in-possession, operated as a going concern collecting funds and paying its postpetition creditors in the ordinary course of business with approximately $6,500,000.00 passing through the Account.

19. There is no allegation that payments to creditors between August 24, 2000, and September 13, 2000, were made outside the Debtor's ordinary course of business or for less than equivalent value.

20. The parties stipulated to information contained in a report prepared by or at the direction of Hansen reflecting the activity with regard to the Account covering the period from August 28, 2000, to September 26, 2000 (the "Report").

21. The last entry in the fifth column for any particular day reflects the available balance at the close of business for the day.

22. Given the information contained in the Report, the Debtor's account balance can be analyzed from two different approaches. One approach is to analyze the amounts on deposit as the "Collected Balance," which is the total funds on deposit in the Bank regardless of whether or not the funds are available for withdrawal or use by the Debtor. The other approach is to analyze the amounts on deposit as the "Available Balance," which is the total funds available to the Debtor for withdrawal at any given time. The available balance approach takes into account only local deposits that have been on deposit for at least seven business days and non-local checks that have been on deposit for at least eleven business days.

23. If the Account balance is analyzed using the Collected Balance approach, the lowest intermediate balance for the time period between August 30, 2000, and September 13, 2000, would be no less than $717,750.00 at the end of any given day.

24. If the Account balance is analyzed using the Available Balance approach, the lowest intermediate balance for the time period between August 30, 2000, and September 13, 2000, would be no less than $394,460.47 at the end of any given day.

25. Page 4 of the Report shows that on September 6, 2000, the Account balance using the Available Balance approach may have dropped to as low as $162,524.28. However, the Trustee and First Security agree that the Report does not necessarily reflect the order that individual items were received by First Security or processed during the day. It is undisputed that at the end of the day on September 6, 2000, the Available Balance was $394,460.47.

## DISCUSSION

### Unjust Enrichment

This dispute involves a transfer that resulted in $725,000.00 being credited to Debtor's bank account instead of $7,250.00 because of a bank encoding error. It is undisputed that the encoding error and transfer of the Disputed Funds took place postpetition, and that prior to the transfer, the Debtor held no claim or interest in the Disputed Funds. The Bank argues that the Disputed Funds remain property of the Bank, that the Trustee's interest[1] in the Disputed Funds is nothing more than a mere possessory interest, and that to permit the Debtor to retain the Disputed Funds would unjustly enrich the estate. The Trustee argues that the estate's interest is more than a possessory interest and that the encoding error and transfer of Disputed Funds should place the Bank on the same footing as any other postpetition administrative creditor. In the alternative, the Trustee argues that if the Disputed Funds are held by the estate in constructive trust, the Bank's claim to

recovery of the Disputed Funds should be limited to those funds that can be traced using the lowest intermediate balance rule.

■■■ In a bankruptcy setting, state law controls the determination of whether or not the bankruptcy estate has an interest in the property in controversy. *Amdura National Distribution Co. v. Amdura Corp., Inc.,* 75 F.3d 1447 (10th Cir.1996). Under Utah law, unjust enrichment occurs whenever a person has and retains money that in justice and equity belongs to another. In order for a claim based on unjust enrichment to be successful, there must be (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value. *Berrett v. Stevens,* 690 P.2d 553, 557 (Utah 1984). The Bank has met each of these elements and the Court finds that on August 30, 2000, the Debtor was unjustly enriched in the amount of $717,750.00.

### Constructive Trust

■■■ Unjust enrichment will support a constructive trust. A constructive trust is an equitable doctrine used for the purpose of working out justice where there is no intention of the parties to create a trust and no express, implied, written or verbal declaration of the trust. *Parks v. Zions First Nat'l Bank,* 673 P.2d 590 (Utah 1983); *In re McGavin,* 189 F.3d 1215 (10th Cir.1999) (Utah law bases constructive trust on the principle of unjust enrich-

---

1. Although it is the Trustee and not the Debtor that now represents the estate, the Trustee takes subject to all valid claims, liens, and equities which might have been asserted against the Debtor and can take no greater rights than the Debtor itself had. *Sender v.*

*Simon,* 84 F.3d 1299 (10th Cir.1996). "Congress intended the trustee to stand in the shoes of the debtor and take no greater rights than the debtor himself had." *In re Hedged–Investments Associates, Inc. v. Buchanan,* 84 F.3d 1281, 1285 (10th Cir.1996).

ment). Here, the undisputed facts clearly and convincingly support the imposition of a constructive trust on the Disputed Funds in favor of the Bank. *In re Hal Taylor,* 133 F.3d 1336 (10th Cir.1998) (circumstances requiring imposition of a constructive trust must be found to exist by clear and convincing evidence). Had the Disputed Funds never been commingled and it were possible to readily distinguish the Disputed Funds from other assets of the estate, the Bank would be entitled to the immediate return of the entire $717,750.00. *In re M & L Business Mach. Co., Inc.,* 59 F.3d 1078 (10th Cir.1995) (assets held by a debtor that were never property of the estate are properly returned to their rightful owner so long as the assets are readily distinguishable from assets to which general creditors have a claim). Unfortunately for the Bank, the Disputed Funds were commingled with other funds to which general creditors have a claim.

### *Tracing of Funds*

■ After receiving the Disputed Funds, the Debtor continued to conduct its business as a Chapter 11 debtor-in-possession, depositing funds from its business into the Account and disbursing funds to its postpetition creditors in the ordinary course of business. If funds held in constructive trust have been commingled, the beneficiary of the constructive trust must trace the funds using the lowest intermediate balance rule. *In re Foster,* 275 F.3d 924 at 927 (10th Cir.2001). The Bank argues that it is not obligated to trace funds because the encoding error and transfer of Disputed Funds occurred postpetition, citing *In re Seneca Oil Co.,* 906 F.2d 1445 (10th Cir.1990) and *Mahan & Rowsey,* 817 F.2d 682 (10th Cir.1987) for the proposition that tracing of constructive trust funds is not required postpetition. The

facts in *Seneca* and *Mahan* are distinguishable from the facts of this case. Both cases involved constructive trusts that arose pre-petition, both required pre-petition tracing of the funds, and both cases used the bankruptcy petition date as the termination date for tracing based on the concept that funds held in constructive trust never become a part of the bankruptcy estate. In the case at hand, the transfer, commingling and disbursement of funds, including the Court's imposition of the constructive trust, occurred postpetition.

■ 11 U.S.C § 541(d) provides that property held at the commencement of a case, such as constructive trust funds, does not become property of the bankruptcy estate. The Court finds that the Disputed Funds never became property of this bankruptcy estate. Although the Disputed Funds never became property of the estate, tracing of the Disputed Funds is required in this case to verify that the Disputed Funds were not disbursed by the Debtor in the ordinary course of business to good faith purchasers for value. Once funds of a constructive trust are paid in good faith[2] to a purchaser for value who had no notice of the trust, then neither the debtor nor the trust beneficiary have any claim to the disbursed funds. *See Research–Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corporation),* 917 F.2d 424 (10th Cir.1990); *Peterson v. Peterson,* 112 Utah 554, 190 P.2d 135 (1948). By tracing the constructive trust funds, the Court can determine if, and to what extent, the Disputed Funds were disbursed to good faith purchasers who had no notice of the origin of the funds. Funds that were so transferred are lost from the trust res, the remaining funds

---

2. There is no allegation that the Debtor failed to act in good faith.

constitute the trust res to which the Bank has a claim.

■■■■ A constructive trust, like any other trust, must have a trust res at all times. A trust is created in property and exists only so long as there is an identified and ascertainable interest in property to be the trust res. *Begier v. I.R.S.*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In circumstances where a constructive trust is declared postpetition, the beneficiary of the constructive trust must trace the funds to identify the trust res in the same manner as if there were no bankruptcy. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding...." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Bankruptcy Courts are directed to apply "reasonable assumptions" to govern the tracing of trust funds. *Begier*, 496 U.S. at 67, 110 S.Ct. 2258. To impose the same tracing requirements as are required under state law is reasonable and will cause no greater hardship on the bank than it would experience outside a bankruptcy setting. Furthermore, a tracing requirement is reasonable when weighed against bankruptcy policy which demands equality of distribution among creditors of equal rank. If the Bank successfully traces its funds, return of the trust res to the Bank will not violate bankruptcy policy because the Bank will be receiving its own money and not property of the estate. If the Bank cannot trace the funds, the Bank becomes a creditor to the extent of its loss, *see Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), and must be treated on an equal basis with other postpetition creditors who advanced funds, goods and services postpetition. While this may seem harsh, "[i]t is the nature of bankruptcies to result in hardship even as they seek to fairly allocate scarce assets under the law in order to reflect policies accepted by Congress." *Amdura*, 75 F.3d 1447, fn. 2.

For the above reasons, the Bank must trace its funds held in constructive trust utilizing the lowest intermediate balance rule.

### Collected Balance vs Available Balance

■■■■ Under the lowest intermediate balance rule, any funds removed from a commingled account are presumed to be the Debtor's funds to the extent the funds exceed the beneficiary's equitable interest. If the Trustee deposits other funds into the commingled account, it is generally held that the Trustee is not replenishing trust funds. New deposits are not subject to the equitable claim of the trust beneficiary and subsequent withdrawals are presumed to draw first upon the new funds. Applying the rule, a constructive trust beneficiary may retrieve the lowest balance recorded after the funds were commingled. *Foster*, 275 F.3d at 927. In this case, the Court is provided with two approaches by which it may trace the constructive trust funds placed in the Account: Collected Balance and Available Balance. The Collected Balance approach focuses only on the dates of deposit and withdrawal of funds and ignores the hold imposed upon new deposits to the Account. The Available Balance approach takes into account the hold imposed by First Security on new deposits to the Account. By taking into consideration the hold imposed upon new deposits, the Available Balance approach partially rebuts the presumption that subsequent withdrawals following a new deposit were drawn first on the new deposits. The additional information utilized by the Available Balance approach

adds precision to the tracing process and minimizes the commingling of constructive trust funds with new deposits.

 Of the two approaches, the Available Balance approach most accurately traces the actual funds that were placed into the Account and will be used by this Court for purposes of computing the lowest intermediate balance of funds held in constructive trust. Use of the Available Balance approach to compute the lowest intermediate balance of the constructive trust funds entitles the Bank the return of constructive trust funds totaling $394,460.47.

### Interest

The Bank, in its motion for summary judgment, seeks entitlement to the interest actually earned on the funds held in constructive trust. Because the funds held in constructive trust have always belonged to the Bank, it is entitled to the interest actually earned by the $394,460.53 in constructive trust funds held from August 28, 2000, until paid.

### Administrative Claim

It is uncontested that the Bank is entitled to a postpetition administrative priority claim for the unpaid balance of the Disputed Funds. Accordingly, the Bank is entitled to a postpetition administrative priority claim in the amount of $323,289.53 which represents the difference between the $717,750.00 originally transferred by mistake and the amount successfully traced using the lowest intermediate balance method. Because the $323,289.53 is unsecured, it is not entitled to the accrual of interest. *United Sav. Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Therefore, it is hereby

ORDERED that the Bank is entitled to immediate payment of $394,460.47, plus interest actually earned, from funds held by the Trustee in constructive trust in behalf of the Bank; and it is further

ORDERED that the Bank is entitled to a postpetition administrative priority claim in the amount of $323,289.53 without accrual of interest.